UNITED STATES *v.* S. S. PERRY (No. 4091)[1]

[1] T. D. 49395.

United States Court of Customs and Patent Appeals, January 24, 1938

*Joseph R. Jackson*, Assistant Attorney General (*John J. McDermott* and *Joseph F. Donohue*, special attorneys, of counsel), for the United States.
*Lawrence & Tuttle* (*Charles F. Lawrence* and *Frank L. Lawrence* of counsel) for appellee.

[Oral argument December 8, 1937, by Mr. Donohue and Mr. Frank L. Lawrence]

Before BLAND, Acting Presiding Judge, and HATFIELD, GARRETT, and LENROOT, Associate Judges

BLAND, Acting Presiding Judge, delivered the opinion of the court:

This is an appeal by the United States from a judgment of the United States Customs Court, First Division, one judge dissenting, in which appellee's protest against the collector's classification and assessment of duty on certain celluloid poultry leg bands was sustained.

On July 21, 1932, appellee entered at the port of San Francisco the celluloid poultry leg bands in controversy. The collector classified the same under paragraph 31 (b) (2), Tariff Act of 1930, and assessed the same with duty at 60 per centum ad valorem. On August 28, 1933, appellee protested the said classification and assessment of duty, claiming the merchandise to be free of duty under paragraph 1604 as agricultural implements. Thereafter, on May 9, 1934, the appraiser made answer to the protest and reported to the collector, stating that:

> The celluloid poultry leg bands are composed in chief value of compounds of celluloid, not acetate, and are therefore dutiable as returned by this office at 60% ad valorem under paragraph 31 (b) (2). The importer claims them to be entitled to free entry under paragraph 1604 as agricultural implements. They are not implements of any kind and have no agricultural use. * * *

On June 11, 1934, the collector reported to the United States Customs Court and transmitted to it the protest, the sample of the merchandise, the appraiser's answer to the protest, and other papers.

The pertinent parts of the paragraphs of the Tariff Act of 1930 which require consideration follow:

PAR. 31. \* \* \* (b) All compounds of cellulose (except cellulose acetate, but including pyroxylin and other cellulose esters and ethers), and all compounds, combinations, or mixtures of which any such compound is the component material of chief value:

\*　　　　\*　　　　\*　　　　\*　　　　\*　　　　\*　　　　\*

(2) made into finished or partly finished articles of which any of the foregoing is the component material of chief value, not specially provided for, 60 per centum ad valorem.

PAR. 1604. Agricultural implements: Plows, tooth or disk harrows, headers, harvesters, reapers, agricultural drills and planters, mowers, horserakes, cultivators, threshing machines, cotton gins, machinery for use in the manufacture of sugar, wagons and carts, cream separators valued at not more than $50 each, and all other agricultural implements of any kind or description, not specially provided for, whether in whole or in parts, including repair parts: *Provided*, That no article specified by name in Title I shall be free of duty under this paragraph.

The imported articles are cellulosic rings about seven-eighths of 1 inch in diameter with the ends overlapping in coil spring fashion. They are of various colors and are sprung onto the legs of poultry.

In view of our conclusion there are three main issues to be decided. First, are the poultry leg bands agricultural implements? Second, are they "specially provided for" elsewhere than in paragraph 1604? Third, are they such articles as are specified by name in title I of the Tariff Act of 1930? Other questions which are involved in the decision of the above issues must also be decided. The first issue involves two considerations. First, are the articles at bar implements of any kind? Second, if they are implements are they agricultural implements? This question calls for a consideration of the chief use of the articles.

On several occasions this court has been called upon to consider what constitutes an agricultural implement under free list provisions reading "all other agricultural implements of any kind or [and] description, not specially provided for." This provision first appeared in the 1913 tariff act and also appears in the 1922 and 1930 tariff acts.

In *Wonham (Inc.) et al.* v. *United States*, 20 C. C. P. A. (Customs) 198, T. D. 45982, certain bamboo rakes were held not to respond to the provision because the record did not show that they belonged to the class of articles which "were chiefly used as agricultural implements at or immediately prior to the enactment of the Tariff Act of 1922." As supporting authority, *United States* v. *Boker & Co.*, 6 Ct. Cust. Appls. 243, T. D. 35472; *United States* v. *Tower*, 6 Ct. Cust. Appls. 562, T. D. 36199; *Wilbur-Ellis Co. et al.* v. *United States*, 18 C. C. P. A. (Customs) 472, T. D. 44762; and other decisions were cited. The agricultural character of the bamboo rakes was a matter of controversy in the trial court. The importer contended that they were used by farmers for raking up litter in barns, and were also used

in vegetable gardens, strawberry patches, and elsewhere. The Government by its testimony attempted to show that they had no other use than for raking lawns, flower beds, and under rose bushes. The court did not pass upon the agricultural character of the rakes since there was no testimony which went to the question of *chief* use.

In *United States* v. *Spreckels Creameries, Inc.*, 17 C. C. P. A. (Customs) 400, T. D. 43835, certain cylindrical metal ten-gallon cans intended for use in the transportation of milk were involved. It was there held that the production of milk and milk products was an agricultural pursuit and that dairying was a branch of the agricultural vocation. It was further held that: "However, it is well established upon both reason and authority that in customs law the classification of merchandise as an agricultural implement is dependent upon the *chief* use of such merchandise." The case turned upon the point that the chief use by the farmer or dairyman had not been shown.

In *United States* v. *Boker & Co.*, *supra*, hedge shears especially suited for pruning trees and shrubbery were denied classification as agricultural implements under the tariff act of 1913 under a provision identical, in respects with which we are at the moment concerned, with the one here involved. In discussing the meaning to be given to the word "agricultural" the court said:

While, therefore, "agriculture" in its broad application may extend into and include elements of horticulture, viticulture, arbor culture, and other *allied* industries and pursuits, in its primary significance it extends to and embraces only those parts of all such as pertain to human and incidental animal subsistence—the substantial requirements of life (food) and possibly man's comfort (raiment), and not the merely pleasurable pursuits; the necessities and not the essentially pleasurable or ornamental.

The term "of any kind and description" was discussed in the following language:

Much stress is laid upon the words "all other agricultural implements of any kind and description." While the words "of any kind and description" are broad and most comprehensive, we must bear in mind that they are predicated of and limited to "*agricultural* implements" and therefore can not include more than those terms embrace, though of course their effect and office is to exhaust everything within that literal confinement. We are accordingly relegated to those words as above defined for the scope of this phrase and paragraph.

It was then held that the hedges which the shears were intended to prune were purely ornamental whether on the farm or about the city home and that the articles were not agricultural implements.

*United States* v. *Tower*, *supra*, involved rakes in part of metal. In view of the testimony and in the light of the official report of the appraiser, they were held to be lawn rakes, and under the authority of *United States* v. *Boker & Co.*, *supra*, the court concluded that they "serve no purpose in the production of food from the soil, nor in the raising of domestic animals thereon," but that they were used for the

improvement of ornamental lawns and therefore were not agricultural implements.

We deem it unnecessary to discuss other authorities relating to this phase of the case. An examination of the pertinent authorities, however, discloses that the courts have always given agricultural free list provisions like the one at bar, and many other tariff enactments which were intended to benefit agriculture, a very broad and liberal construction so that the evident purpose of Congress especially to favor agriculture might be carried out. *United States* v. *American Express Co.*, 12 Ct. Cust. Appls. 483, T. D. 40693. At the same time this court has declined to depart from the ordinary meaning of the term "agricultural" so far as to permit the free importation of articles used for ornamental or purely pleasure purposes even though such use was by agriculturists.

As far as we have been able to observe, no court has passed upon the direct proposition as to whether or not the raising of poultry is an agricultural pursuit. Nor has the exact question presented here ever been considered by any court prior to the institution of the present suit. After much consideration, we are of the opinion that the raising of poultry is an agricultural pursuit in the same sense that the raising of livestock would be. In this view it would be clear that watering troughs and other articles contributing to the health, growth and well being of poultry would be agricultural implements. We also conclude that the celluloid poultry leg bands at bar, used for identification purposes, serve a purpose in the successful and efficient raising of poultry and if they were chiefly so used at or immediately prior to the passage of the Tariff Act of 1930 they should be regarded as agricultural in their character. It would seem to be illogical to hold that a chicken trough would be an agricultural implement and that implements used to identify poultry would not be. In any event, they are not used for ornamental or pleasurable purposes such as were controlling of decision in *United States* v. *Boker & Co., supra.*

The Government strenuously argues that the celluloid poultry leg bands are not implements irrespective of their agricultural character. We think the term "implements of any kind or description" as it appears in paragraph 1604 should not be given its narrowest meaning. Frequently, "implement" is regarded as being synonymous with a tool or utensil used in manual work. The term has a broader meaning which we think should be accepted in arriving at the intent of Congress in the enactment of paragraph 1604. We quote several definitions of the noun "implement" from Webster's New International Dictionary:

implement. 1. That which fulfills or supplies a want or use; esp., an instrument, tool, or utensil used by man to accomplish a given work; as, the *implements* of trade, of husbandry, or of war.

2. A constituent part; an element. *Obs. & R.*

3. *Scots Law.* Fulfillment, performance.

Syn. *implement, tool, utensil, instrument* agree in suggesting relatively simple construction and personal manipulation. *Implement* and *tool* are often interchangeable. But *implement* is the broader term, frequently implying that by which any operation is carried on: *tool* commonly suggests the implements of a craftsman or laborer; * * *

It seems to us that the poultry bands at bar are implements of the poultry raising business when chiefly used for the purpose of identification of poultry.

As before stated, the collector classified the merchandise under paragraph 31 (b) (2) as an article made of cellulose. His report, which he made to the trial court, in which he adopted the advisory classification of the appraiser, was made more than ninety days after the filing of the protest, and under such circumstances it may not be regarded as an impeachment of his presumed finding (see *Pacific Guano & Fertilizer Co. et al.* v. *United States,* 15 Ct. Cust. Appls. 218, T. D. 42240) that the articles were not at the time of or immediately prior to the passage of the Tariff Act of 1930 chiefly used in the poultry raising business. See *National Hat Pin Co.* v. *United States,* 5 Ct. Cust. Appls. 435, T. D. 34971. It was, therefore, under the circumstances of this case, incumbent upon the protestant to prove that the articles were chiefly used in the manner above stated in the poultry raising business on or just prior to the date of the passage of the act. We will proceed to examine the record upon this phase of the case.

The importer produced the testimony of but one witness and the Government none. The sole witness was T. E. Woodhull, at that time Pacific Coast manager of Spratt's Patent, Ltd., a national concern dealing in dog foods and poultry supplies of various kinds. Woodhull stated that for more than twenty-five years he had been engaged in dealing with poultry supplies, and gave his opinion as to the chief use of the article in controversy. After stating that he had been on the Pacific Coast since 1912 and immediately prior to that time for two years in St. Louis and previous to that "back East" and that during all that time he was distributor and agent for Spratt's Patent Limited handling the same type of merchandise, he stated that he was familiar with the merchandise at bar and that "We have sold articles of this sort for, possibly, 10 years or more." The following are extracts from the record:

Q. What class of trade have you sold them to?—A. Dealers in poultry supplies

Q. Have you purchased them also?—A. Yes, sir.

Q. Domestic merchandise or foreign?—A. Both.

Q. From what parts of the country have you purchased them?—A. New York State, Chicago, and Kentucky.

Q. Have you, during that time, learned the use of such merchandise represented by Exhibit 1?—A. Yes, sir.

Q. Have you observed it being used in many instances?—A. In some instances, yes.

Q. What has that use been?—A. They are used as a mark of identification.

Q. Where?—A. Placed on the leg of a chicken and used as a mark of identification.

Q. Other poultry besides chickens?—A. Any kind of chickens, turkeys, and in some cases even ducks, geese, pigeons, and pheasants.

Q. By men who are commercially in that business of raising poultry?—A. Yes, sir.

Q. Do you know the purpose of placing the article upon the legs?—A. Well, it is done for various reasons, but I think the most common one is to identify the year. They will band a flock of chickens with a certain color, and next year use a different color, and when those chickens reach a certain age they are discarded.

Q. For the purpose of telling the age of poultry?—A. Yes, sir.

Q. As far as your experience has gone, has the use you have just referred to been the major use of the articles?—A. Absolutely.

&ast;  &ast;  &ast;  &ast;  &ast;  &ast;  &ast;

Q. Do you know of any other use for such merchandise?—A. In a very small way.

Q. You mean the use is in a small way you are referring to?—A. Yes, sir.

Q. Something you heard of?—A. I know some people have bought small quantities of these to use to hang curtains.

Q. As part of drapes affixed to curtains?—A. Yes, sir, but a very, very small quantity.

Q. From your experience in the last twenty-five years have you an opinion as to the use of such merchandise as Exhibit 1 throughout the areas you are familiar with?

&ast;  &ast;  &ast;  &ast;  &ast;  &ast;  &ast;

—A. Yes.

Q. What in your experience has been the chief use of such merchandise?—A. The banding of poultry.

&ast;  &ast;  &ast;  &ast;  &ast;  &ast;  &ast;

X Q. How long have you personally bought articles like Exhibit 1?—A. For more than 10 years, and possibly 20 years.

X Q. You have bought during that period constantly?—A. We generally buy once or twice a year.

X Q. Have you ever bought articles like Exhibit 1 personally?—A. Yes, sir. It is very probable that we bought this particular lot.

X Q. I am talking about you. Are you in charge of buying?—A. Yes; I am the manager of a branch. The buying is either done by me or my chief assistant.

X Q. Do you sell in wholesale quantities?—A. Yes, sir.

X Q. Are you in charge of selling, too?—A. Yes, sir.

X Q. Over what territory have you sold this merchandise like Exhibit 1?—A. Throughout the Pacific Coast section, as far back as Salt Lake City, principally around Petaluma, Santa Cruz, Hayward, and the principal egg districts where poultry farming is specialized in.

X Q. Approximately how many times have you seen articles like Exhibit 1 used as leg bands for poultry?—A. Well, a good many times, I couldn't say just how many.

X Q. The times you saw it used were during what period?—A. For the past 20 years.

X Q. In this section of the country?—A. Yes, sir.

&ast;  &ast;  &ast;  &ast;  &ast;  &ast;  &ast;

R. Q. Do you sell poultry feed?—A. Yes, sir.

R. Q. And as Spratt's representative you sell that throughout the United States?—A. Yes, sir.

R. Q. Do you know the principal poultry center of the United States?—A. The three Pacific Coast States, California, Oregon and Washington.

R. Q. And of those states, say, of California, do you know where the center is in California?—A. Petaluma is recognized as the leading poultry and egg-producing district or center.

R. Q. How far away is that?—A. About fifty miles.

R. Q. Do you sell in that particular area?—A. We do.

The Government contends that the testimony does not show the chief use of the article for any purpose; that the experience of the witness was "limited to the Pacific Coast states" and relies for supporting authority for its contention upon the case of *Pacific Guano & Fertilizer Co. et al.* v. *United States, supra.*

It must be remembered that in that case the testimony was very different from the testimony in the case at bar, and one of the witnesses for the importer testified that high-grade tankage was chiefly used in California as fertilizer; another of importer's witnesses, whose experience was not confined to California, testified positively that all high-grade tankage produced by Swift & Co. in the United States was in Kansas, Nebraska, Iowa, Illinois and in the "Corn Belt" used as hog feed. Our conclusion as to the weight to be given the evidence turned largely upon the proposition that the use of the particular tankage imported did not determine the classification of the merchandise but that the important question was whether tankage of the *grade* imported was chiefly used as a fertilizer in the United States.

We think the above-quoted testimony from the witness Woodhull, who was unusually well qualified, overcomes the presumed finding of the collector, and that since no evidence was introduced to the contrary and no real issue made on the point, it must be concluded that appellee on the question of chief use made a *prima facie* case. Under such circumstances, if the Government sought to controvert the issue, it was its duty to introduce testimony on the subject. See *Klipstein* v. *United States*, 1 Ct. Cust. Appls. 122, T. D. 31120.

The trial court has found from the evidence of record that the chief use of the merchandise at bar was for the banding of poultry and we think the evidence supports that finding. Certainly we cannot say that its finding is against the weight of the evidence.

It seems to be the position of the Government that it was the duty of the importer to prove by some witness better qualified than Mr. Woodhull that in every part of the United States the chief use of the article involved was agricultural. In the first place, it is difficult for us to understand how in the poultry supply business it would be possible to produce a witness with a wider experience in selling and handling poultry supplies such as the articles here involved. Wood-

hull's greatest activities during the ten years immediately preceding his testifying were in the principal poultry raising centers of the United States. Who could be better qualified to give an opinon upon the question? In the next place, if it should appear that in some places in the United States the article was chiefly used for another purpose this fact would not of itself be sufficient to determine that it was not chiefly used for agricultural purposes in the United States. The determination of chief use not only involves a territorial or geographical consideration but the quantity of the merchandise used. It is obvious that poultry is raised in every section of the United States. If the Government's contention, which, in effect, is that a witness or witnesses must be produced to prove actual use in every part of the United States, was approved, in our judgment it would result in a situation where it would be almost impossible to overcome a presumed finding by the collector such as has arisen in this case.

The next question to decide is whether or not the leg bands at bar are articles "specified by name in Title I" of the Tariff Act of 1930. If this question is answered in the affirmative, it follows that the mer-- chandise is not free of duty under paragraph 1604. It will be noticed that the proviso says: "specified by name." The phrase "not specially provided for" was not depended upon by Congress, as is so frequently the case in the enactment of tariff paragraphs, to bring about the result desired. In order for it to be taken out of the agricultural implement paragraph by other provisions it was necessary that it had to be "specified by name" in some provision of title I.

To hold that the term "all compounds of cellulose * * * made into finished * * * articles" is specifying celluloid poultry leg bands by name, would, in our opinion, unduly restrict the application of the very broad phrase in paragraph 1604 "and all other agricultural implements of any kind or description." We do not think that when Congress used the term "specified by name" it used it synonymously with "provided for." The term "all compounds of cellulose * * * made into finished * * * articles" is quite general in its scope. There are many different kinds of compounds and many different kinds of compounds of cellulose. To name a general class such as is done in paragraph 31, *supra*, is not to specify an article by name, within the meaning of paragraph 1604.

As far as we have been able to observe, the decision of this court in *United States* v. *American Express Co.*, *supra*, is the nearest one in point. There, certain metal knives, used exclusively as parts of sugar making machinery, were classified as "all other cutting knives used in power or hand machines" under paragraph 356 of the Tariff Act of 1922. They were claimed to be parts of machinery for use in the manufacture of sugar under the free list provision, paragraph 1504 (the predecessor of paragraph 1604, Tariff Act of 1930). In holding

that the term "all other cutting knives used in power or hand machines" did not specify the involved knives by name, the court said:

The appellant insists the article of importation should be considered as specifically mentioned in paragraph 356, under the language, "and all other cutting knives and blades used in power or hand machines."

Such language does not constitute a specific or eo nomine designation of the articles of importation here. In the first place, the evidence shows that these articles are more than knives and perform other essential processes in the making of beet sugar besides the mere cutting of the beets used. But, aside from that, it can not be held that such general language as "all other cutting knives and blades used in power or hand machines" should be considered as a special provision for and supplanting such specific language as that of paragraph 1504: "Machinery for use in the manufacture of sugar * * * whether in whole or in parts, including repair parts."

Nor is it necessary to adopt any such forced construction. The proviso to paragraph 1504, supra, doubtless was intended to refer to the many agricultural implements which are mentioned eo nomine in Title I of the act of 1922, such as pruning knives and budding knives in paragraph 354, hay, sugar-beet, and beet-topping knives in paragraph 355, animal clippers, pruning and sheep shears in paragraph 357, and shovels, spades, scoops, scythes, sickles, grass hooks and corn knives in paragraph 373.

If the said provision of paragraph 356 of the Tariff Act of 1922 is not a provision which specifies by name the knives there involved it would seem to follow that in the instant case there could be no possible merit in the Government's contention that "all compounds of cellulose * * * made into finished * * * articles" specifies by name the leg bands at bar.

The question of the specificity of the two competing paragraphs is not argued in this court. Certainly there can be no question but that if the articles fall within the free list paragraph 1604, and are not specified by name in title I, they are classifiable as free of duty under paragraph 1604. "Agricultural implements" is a designation by use and the involved importation is more specifically provided for in paragraph 1604 than in paragraph 31 (b) (2). It is unnecessary here to prolong this opinion by entering into a discussion of the force of this consideration in determining specificity nor do we think the phrase in paragraph 1604 "not specially provided for" changes the situation since the same phrase is found in the above-quoted part of paragraph 31. Under this kind of circumstance, the term "not specially provided for" in paragraph 1604 should be disregarded. *United States* v. *Lo Curto & Funk*, 17 C. C. P. A. (Customs) 19, T. D. 43319; *United States* v. *Richardson*, 13 Ct. Cust. Appls. 280, T. D. 41214.

Having concluded that the chief use of the poultry leg bands at bar at the time of and prior to the passage of the Tariff Act of 1930 was an agricultural use within the meaning of paragraph 1604; that the bands respond to the term "implements"; that they are not

specified by name in title I of the act; and that they are more specifically provided for in paragraph 1604 than in paragraph 31, it follows that the trial court correctly sustained the protest of the importer, and its judgment is accordingly *affirmed*.