PACIFIC GUANO & FERTILIZER CO. ET AL. *v.* UNITED STATES
(No. 2866)[1]

United States Court of Customs Appeals, June 6, 1927

*Frank L. Lawrence* (*Martin T. Baldwin* of counsel) for appellants.
*Charles D. Lawrence,* Assistant Attorney General (*Hugo P. Geisler,* special attorney, of counsel), for the United States.

[1] T. D. 42240.

[Submitted without oral argument May 12, 1927]

Before GRAHAM, Presiding Judge, and SMITH, BARBER, BLAND, and HATFIELD, Associate Judges

SMITH, Judge, delivered the opinion of the court:

Ground tankage imported from Argentina was classified by the collector at San Francisco as a nonenumerated manufactured article and accordingly assessed for duty at 20 per centum ad valorem under that part of paragraph 1459 which reads as follows:

1459. That there shall be levied, collected, and paid on * * * all articles manufactured, in whole or in part, not specially provided for, a duty of 20 per centum ad valorem.

The importers protested that the merchandise imported was not subject to duty and was entitled to free entry under that part of paragraph 1583 of said act which reads as follows:

Guano * * * manures, and all other substances used chiefly for fertilizer, not specially provided for * * *

The United States Customs Court overruled the protest and the importers appealed.

On the hearing before the board, William C. Haaker testified on behalf of the importers that the merchandise covered by the protests 104719–G and 104720–G was imported by Willits & Co. (Inc.) and sold by that company to the Pacific Guano & Fertilizer Co.

Howard L. Burdick testified for the importer that he was traffic manager for the Pacific Guano & Fertilizer Co. and that that company purchased from Willits & Co. 3,679 bags of tankage covered by protest 57247–G; that the Pacific Guano & Fertilizer Co. also purchased from Willits & Co. 5,080 bags of tankage covered by protest 104719–G and 37 tons of tankage covered by protest 104720–G.

C. C. James, called for the importers, testified that he was the main-line manager of the Pacific Guano & Fertilizer Co.; that he had been engaged in the fertilizer business for 18 years, for four of which years he was employed as a chemist and for seven years as superintendent; that during the entire 18 years he dealt with tankage and was familiar with its use and disposition in Honolulu; that as chemist he analyzed the tankage and as superintendent he had charge of mixing it for fertilizers; that since November, 1924, he had been stationed in San Francisco, but was not as familiar with the operations of the company in San Francisco as he was in the Hawaiian Islands; that he knew the kind of tankage purchased by the Pacific Guano & Fertilizer Co. and that most of such tankage was mixed by the Pacific Guano & Fertilizer Co. for the consumer and that the records of the company showed just what had been done with each shipment; that the tankage dealt with by him in the Hawaiian Islands was substantially of the same class as that covered by the protests;

that the tankage imported at Honolulu was mixed with other fertilizer materials and sold as a complete fertilizer and that no tankage dealt in by the Pacific Guano & Fertilizer Co. at Honolulu was used for any purpose except that of fertilizer; that only two companies in the Hawaiian Islands dealt in tankage; that he presumed that the Pacific Guano & Fertilizer Co. did half the business; that he could not say for certain what use the other company made of its tankage, but that he did know that some of it was used for fertilizer purposes; that the Hawaiian Islands produce no tankage and that the Pacific Guano & Fertilizer Co. easily disposed of 1,000 tons of tankage a year in the islands; that most of the tankage used in the Hawaiian Islands came through the United States office of his company; that he thought that there was no demand in the Hawaiian Islands for tankage except for fertilizer purposes. On cross-examination the witness said that he had not purchased tankage but that as superintendent he disposed of it as it was purchased by his company; that as chemist of the company he analyzed the tankage purchased by it in order to determine the percentages of nitrogen and phosphoric acid which it contained; that nitrogen and phosphoric acid are valuable ingredients of fertilizers, particularly nitrogen; that he knew that tankage could be used as a fertilizer; that the object of his analysis was to secure information for the making of a complete fertilizer and to secure a proper mixture; that he had no information except hearsay as to whether the tankage was used as hog feed, chicken feed, or for any purpose other than that of a fertilizer; that all tankage with which he was familiar contained nitrogen, ammonia, and phosphoric acid in varying percentages; that the tankage dealt with by him in Honolulu contained from 6 to 10 per centum of nitrogen and from 6 to 8 or 9 per centum, and sometimes higher, of phosphoric acid; that he could not state the quantities of phosphoric acid and nitrogen in the tankage dealt with by him since he came to California, that the percentages did not vary much during the last 18 years. On redirect examination the witness said that 11.20 per centum of ammonia represented 10 per centum of nitrogen; that tankage is usually bought and sold on the basis of the ammonia content; that the ammonia content in the tankage handled in Honolulu ran from 8 to 12 or 13 per centum; that since he had been in California he had heard that a great deal of tankage was used for purposes other than that of a fertilizer; that some of the customers of the Pacific Guano & Fertilizer Co. were engaged in the feed business; that he was not prepared to state off hand the comparative proportions used for feed and for fertilizer purposes.

Milton Haas testified for the importers that he was vice president and secretary of the Pacific Bone Coal & Fertilizer Co. and that for all of his business life he had been in the business of manufacturing

bone black and mixing materials sold to orchards; that he was the manager of his concern and had been for 16 years familiar with the uses of the products handled by it; that his firm dealt in both imported and domestic tankage; that tankage differs as to content, but that tankage does contain nitrogen, bone phosphate of lime, and ammonia; that his firm imported only Argentine tankage; that it handled at times domestic tankage; that in 1922 his firm handled 750.753 tons of tankage containing from 7.33 to 12.7 per centum of ammonia; in 1923, 751.451 tons, containing from 9.35 to 12.60 per centum ammonia; in 1924, 188.0765 tons, containing from 12.41 to 13.09 per centum ammonia; in 1925, 155.796 tons, containing from 11.22 to 12.41 per centum ammonia, and that all of that tankage was used as a manure or complete fertilizer; that most of said tankage dealt with by his firm in 1922, 1923, 1924, and 1925 was made up into a fertilizer, but that some shipments were sold to orange groves just as it was imported; that tankage running from 7.33 to 9.35 per centum ammonia is all used for fertilizer, *but that that which ran higher in ammonia content was more valuable as a fertilizer and was a high-grade fertilizer;* that the price paid for tankage depends altogether upon the analysis; that all of the tankage used by his firm whether it ran under 10 per centum or over was used for agricultural purposes and as a fertilizer. On re-cross-examination the witness stated that tankage is bought and sold on the basis of the unit of ammonia content; that is to say, if a ton of tankage contains 12 per centum of ammonia it is bought and sold at so many dollars for each per centum of ammonia found in the ton; that he had no knowledge of the use to which the importations covered by the protests were put; that he understood that tankage was used for hog feed and chicken feed but that he had actually seen it used for fertilizer purposes only. On redirect examination he testified that his testimony as to the value of components of tankage and the importance of its components was confined to its uses for fertilizer purposes, and that he was not making any statement as to the suitability of such merchandise for feeding purposes. On re-cross-examination the witness said that all tankage such as that referred to by him in his tabulation marked Exhibit 1 was sold to concerns engaged in the fertilizer business.

Karl F. Holzmuller, sworn as a witness for the importer, testified that he was office manager of the Pacific Guano & Fertilizer Co. and that he had charge of the accounts, records, and financial payments of the company and verified its invoices; that protest 52247–G covered two lots of tankage, one of 1,539 bags containing 88 tons, and one of 2,140 bags containing 103 tons; that the 1,539 bags went into fertilizer and that the 2,140 bags were used for making poultry feed; that protest 104719–G covered 5,080 bags of tankage, 4 tons of which went into fertilizer and 247 tons of which was blended with

other materials for the making of poultry feed; that protest 104720–G covered 37 tons of tankage, all of which was used for the making of poultry feed; that he could not say whether the tankage used for poultry feed contained components which were not present in tankage used as a fertilizer; that he did not know why some of the tankage was available for poultry feed; that the larger part of the tankage handled by his company was used as a fertilizer and that most of it was sold to orange growers for that use; that the tankage not sold to orange growers was reworked for sale as a fertilizer or for poultry feed; that the labor expended in reworking tankage for sale as a fertilizer or for sale as a poultry feed is about the same; that in either event it must be reground. On redirect examination the witness stated that *made-up fertilizer* contains nitrate of soda and potash and could not be used for feed purposes; that in October, 1922, his company imported on the *Panama Maru* 7,510 bags of tankage containing 427 tons or 854,916 pounds and that all of that importation was used for fertilizer; that of 23,913 pounds of tankage imported in October, 1922, on the *West Katan*, 192 (?) tons were used as fertilizer; that of the tankage imported on the *Elveric* in January, 1924, 50 tons went into fertilizer and 60 tons into poultry feed; that the 190 tons of tankage imported on the *West Cactus* in February, 1925, were used for fertilizer; that the entire amount of 90 tons of tankage imported on the *Pawnee* in August, 1924, was used to make poultry feed; that the entire lot of 226 tons imported on the *Hollywood* in April, 1925, was used for fertilizer; that of the 212 tons of tankage imported on the *West Notus* in February, 1925, 209 tons were used as fertilizer and 3 tons for poultry feed; that the entire lot of 15 tons of tankage imported on the *West Jappa* in December, 1923, was used for fertilizer; that tankage is bought and sold on the basis of a short ton. On recross-examination the witness said that he could not say whether all of the tankage could have been used for poultry feed.

(At this point it was stipulated by counsel for the Government and counsel for the importers that the tankage imported on the *Panama Maru* in October, 1922, the tankage imported on the *West Katan* in October, 1922, the tankage imported on the *Elveric* in January, 1924, the tankage imported on the *West Calera* in March, 1924, the tankage imported on the *West Cactus* in February, 1925, the tankage imported on the *Pawnee* in August, 1924, the tankage imported on the *West Cactus* in July, 1924, the tankage imported on the *Hollywood* in April, 1925, the tankage imported on the *West Notus* in February, 1925, and the tankage imported on the *West Jappa* in December, 1924, contained approximately 12 per centum of ammonia; that of the 382,787 pounds of tankage imported on the *West Carmargo* in January, 1924, 206,364 pounds contained 12 per centum of ammonia, and 176,423 pounds contained 16 per centum of ammonia.)

William C. Haaker, vice president of Willits & Co. (Inc.), recalled for the importers, testified that for 18 years he had been connected with the Western Meat Co., one of the large packing houses on the Pacific coast; that the Western Meat Co. did a large packing-house business; that by reason of his experience with the Western Meat Co. he became familiar with all forms of animal tankage; that the refuse of packing houses, such as bones, hoofs, gristle, lungs, and paunches, was put into closed tanks and cooked under steam pressure for the purpose of extracting as much grease as possible from the material; that the residue of the grease-extracting process is tankage material, which is ground, dried, and packed for distribution; that the tankage under protest was produced in the same way and is tankage just as it came from the packing houses in South America; that the grinding of tankage is done for the purpose of facilitating shipment and does not alter the constituents of the tankage; that the grinding does not make it more valuable for feed than for fertilizer purposes; that tankage is shipped in a good many instances to growers for fertilizer in its original form; that when a certain formula is desired by the grower it is mixed with other materials more or less similar in order to secure the definite analysis desired; that it sometimes happens that tankage is rancid, in which case it can be used only as a fertilizer; that tankage is sold on the basis of the ammonia and phosphoric acid contents, and that those two elements are the valuable elements of tankage; that tankage is sold to buyers of fertilizer on the basis of the units of ammonia and phosphoric acid which it contains; that there are two grades of tankage, known as high grade and low grade; *that low-grade tankage contains from 5 to 9½ per centum of ammonia* and that low-grade tankage is commercially suitable only for fertilizing purposes; that high-grade tankage contains from 9½ to 13 per centum of ammonia and is suitable for use as a fertilizer, but that he believed it was sometimes made into feed, although he had no actual knowledge of transactions of that kind; that by far the larger part of high-grade tankage was used *on the Pacific coast as a fertilizer material;* that according to his experience, *on the Pacific coast* high-grade tankage was chiefly used for fertilizer purposes; that very little tankage containing 16 per cent of ammonia was produced. On cross-examination the witness said that large quantities of tankage are imported into southern California and used by citrus growers as a highly desirable plant food; that animal tankage is an organic fertilizer and is preferred by citrus growers; that the principal producers of tankage in South America are Swift & Co., Armour & Co., and Wilson & Co., whose manner of operation is identical with that of meat packers in this country; that the Western Meat Co. was a subsidiary of Swift & Co., and that from the exchange of information he knew Swift &

Co. carried on business in South America just as that company conducted its business in this country; that 8, 10, or 12 per centum of ammonia in tankage does not necessarily determine whether it shall be used as a fertilizer or for something else; that high-grade tankage, containing 12 per centum of ammonia, was quite desirable as a fertilizer; that the freight on high-grade tankage was just the same as that on low-grade tankage; *that low-grade tankage is used for no purpose other than that of a fertilizer, and that it would not be commercially possible to use it for anything else.*

G. P. Bloxham, a witness for the importers, testified that he was manager of the by-products department of the Western Meat Co., the business of which was confined to the Pacific coast; that the company engaged in the business of meat packing and produced by-products of beef, pork, and mutton; that he had full charge of purchases of tankage, poultry, feeds, wool, glue stock, and similar lines; that he performed the same service for Swift & Co. prior to his employment by the Western Meat Co.; that the Western Meat Co. produced tankage and fertilizers; that that company produces 6,000 tons of straight tankage per season, and that as manager of the company he had handled on the Pacific coast about five or six thousand tons of tankage per year, which included both imported and domestic tankage; that most of the imported tankage came from Swift & Co.'s South American plant and that the tankage produced in such plants was high-grade tankage; that the average percentage of compounds in such tankage was $10\frac{1}{2}$ or 11 per centum and that sometimes it ran as high as $12\frac{1}{2}$ per centum; that during the last three years 80 per centum of the imported high-grade tankage was used as fertilizer and 20 per centum as feeding material; that in 1923 and 1924 his concern imported 8,160,415 pounds of high-grade tankage of which they used 1,628,548 pounds as poultry feed or about 19.9 per centum; that that proportion was about the same for previous years; that the company imported a maximum of about 2,000,000 pounds a year of tankage *falling below 10 per centum ammonia and that that tankage was unsuitable commercially for feed purposes; that practically all high-grade tankage produced by Swift & Co. in the United States is used throughout Kansas, Nebraska, Iowa, Illinois, and the Corn Belt from November 15 to April 1 as hog feed; that during the rest of the year the tankage produced by Swift & Co. in the United States is accumulated and some of it is sold to the Southern States as fertilizer;* that 90 per centum of all tankage, high grade and low grade, *produced upon the Pacific coast is used for fertilizer; that very little tankage is produced on the Pacific coast and therefore the bulk of it has to be imported;* that the tankage produced by Swift & Co. in South America is light in color, fine in texture, and could be used for feed if it was not for the odor; that all South American tankage has a

very objectionable odor; that Swift & Co.'s South American product was less open to that objection than that of other producers.

On cross-examination the witness stated *that while the color of tankage varies, the odor is about the same;* that the percentage of ammonia in tankage determines whether it is high grade or low grade; *that the protein content of tankage was the deciding factor as to whether tankage could be used for feed purposes;* that a manufacturer of feed from tankage seeks a tankage which contains as nearly as possible the proteins he desires; *that tankage containing about 12 per centum ammonia contains the percentage of protein desired; that consequently high-grade tankage, containing from 10 to 12 per centum of ammonia, whether domestic or foreign, is more desirable for use as feed.*

Albert E. Barnes, a witness for the importer, testified that he was and had been for 17 years secretary of the Fruit Growers Supply Co. and manager of their fertilizer department; that that company is a cooperative organization having its head office at Los Angeles, Calif., and is composed of about 12,000 citrus-fruit growers in California; that the citrus-fruit growers in California use large quantities of fertilizer and purchase it through the Fruit Growers Supply Co. and also from other dealers in fertilizers in Los Angeles; that imported tankage containing over 10 per centum ammonia and as high as 13 per centum was purchased by the citrus-fruit growers of California and used as fertilizer; that the Fruit Growers Supply Co. of California had purchased between June, 1923, and June, 1925, about 900 tons a year of imported high-grade tankage; that in 1922 approximately 1,000 tons of such tankage was purchased for the citrus-fruit growers. On cross-examination the witness said that citrus-fruit growers purchased tankage for its nitrogen and phosphoric-acid content; that tankage is purchased for feed on the basis of the protein content therein and that *10 or 12 per centum of ammonia would not in itself preclude the use of tankage for hog or chicken feed.*

Ludwig Baruch testified for the importers that he was president of the Agricultural Chemical Works and was engaged in the business of manufacturing fertilizer in Los Angeles; that the company used tankage imported from Argentina for the purpose of making fertilizer for fruit growers in southern California; that in the years 1923 and 1924 the Agricultural Chemical Works handled about 500 tons, or 1,000,000 pounds, of Argentine tankage, which was used for fertilizer purposes; that the tankage so imported contained an average of 11½ per centum of ammonia and was high-grade tankage; that tankage running below 10 per centum ammonia is low-grade tankage; that in the year 1922 the Agricultural Chemical Works used 200,000 pounds of tankage for the making of fertilizer. On cross-examination the witness stated that 90 per centum of the tankage handled by the

company was used for the manufacture of fertilizer; that the terms "high-grade tankage" and "low-grade tankage" have been used for 32 years; that in the manufacture of fertilizer 75 per centum of low-grade tankage and 25 per centum of high-grade tankage is used; that 25 per centum of high-grade tankage is mixed with 75 per centum of low-grade tankage for the purpose of raising the percentage of ammonia; that fertilizer made of low-grade tankage and high-grade tankage is not as valuable as that made of high-grade tankage.

T. W. Houser testified for the importers that he was a manufacturer of fertilizer in Los Angeles and was connected with the Southern California Fertilizer Co.; that between September, 1922, and December, 1924, the Southern California Fertilizer Co. had imported about 1,410 tons of tankage, of which 750 tons was high-grade and about 660 tons low-grade tankage; that some of the tankage was used for the manufacture of fertilizer and some of it was sold direct to citrus-fruit growers for use in its imported condition; that in the spring of 1922 the company imported 200 tons, or 400,000 pounds, of high-grade tankage. On cross-examination the witness said that the price of tankage was determined by the ammonia and the bone phosphate of lime contents; that in preparing tankage for fertilizer, fish meal, blood meal, nitrate of soda, and sulphate of ammonia were used as ingredients; that he had no knowledge of the use of tankage for any purpose other than that of fertilizer.

A. L. Chandler, a witness for the importers, testified that he was fertilizer manager of the Yellow Orange Distributors of Los Angeles, Calif., a cooperative marketing association; that the members of the association had imported between June, 1923, and June, 1925, 250 tons of Argentine high-grade tankage, or about 500,000 pounds; that high-grade tankage ranges from 10 to 13 per centum of ammonia; that high-grade tankage was used by the citrus-fruit growers in California as a fertilizer, but that he had heard that it was also used as feed. On cross-examination the witness stated that the high-grade tankage was sold to the citrus-fruit producers without manipulation.

W. St. John Burns testified on behalf of the importers that he was an accountant with the Pacific Guano & Fertilizer Co., engaged in the business of manufacturing fertilizers in Los Angeles, Calif.; that he kept the records of the company showing the disposition of merchandise handled by it; that the company not only manufactured fertilizers but also to some extent poultry feeds; that the records of the company showed high-grade tankage and low-grade tankage which went into feed and which was sold as fertilizer; that from October, 1922, to June 29, 1925, 3,461 thousand pounds of high-grade tankage was used for fertilizer and 2,933 thousand pounds was used for poultry feed; that of the low-grade tankage 3,730 thousand pounds were used for fertilizer and 263 thousand for poultry feed;

*that the company sold more low-grade than high-grade tankage for fertilizer.*

The evidence hereinbefore recited establishes, first, that tankage is produced in the United States by American firms and by some of the same firms in Argentina; second, that the methods used in Argentina and in the United States for the production of tankage and the results accomplished thereby are substantially the same; third, that there are two general classes of tankage, known as high-grade tankage and low-grade tankage, and that tankage carrying less than $9\frac{1}{2}$ per centum ammonia is known as low-grade tankage and tankage which contains $9\frac{1}{2}$ per centum of ammonia or more is known as high-grade tankage; fourth, that tankage is bought and sold on the basis of the ammonia content and at a price applied to each per centum of ammonia found in the ton; fifth, that low-grade tankage is commercially suitable for fertilizer purposes only, and that high-grade tankage is suitable for use as a fertilizer and for feed; sixth, that high-grade tankage is sometimes mixed with low-grade tankage in order to furnish a larger percentage of ammonia, thereby better fitting the mixture for fertilizer purposes; seventh, that the tankage imported contained more than 10 per centum of ammonia; eighth, that in California both domestic and imported high-grade tankage is chiefly used as a fertilizer material; ninth, that most of the imported tankage comes from Swift & Co.'s South American plants and that the tankage produced in such plants is high-grade tankage; tenth, that in California, for the three years prior to June 29, 1925, 80 per centum of imported high-grade tankage was used as a fertilizer and 20 per centum as feeding material; eleventh, *that all high-grade tankage produced by Swift & Co. in the United States is used from November 15 to April 1 as hog feed throughout Kansas, Nebraska, Iowa, Illinois, and the Corn Belt, and that for the rest of the year such tankage is accumulated and some of it is sold to the Southern States as fertilizer.*

The fact that high-grade tankage is chiefly used in California as a fertilizer hardly justifies the conclusion that such tankage is chiefly used *in the United States* for that purpose. Bloxham, one of the witnesses for the importer, whose experience was not confined to California, testified positively that all high-grade tankage produced by Swift & Co. in the United States was used between November 15 and April 1 in Kansas, Nebraska, Iowa, Illinois, and the Corn Belt as hog feed. According to that witness, between April 1 and November 15 the high-grade tankage of Swift & Co. is accumulated and some of it is sold as fertilizer in the Southern States. Just how much of such tankage was sold for fertilizer the witness did not say, and in the absence of evidence to the contrary it must be presumed that most of it is accumulated to be sold as feed. In view of Bloxham's testimony and of the lack of evidence as to the

228

disposition of high-grade tankage produced by Armour & Co. and Wilson & Co., we can not hold that high-grade tankage was immediately prior to the importation of the goods in issue chiefly used in the United States as fertilizer.

The actual use of the *tankage in controversy* and the chief use of high-grade tankage *in California* does not determine the classification of the merchandise. Whether tankage of the *grade* imported was chiefly used as a fertilizer in the United States was the issue presented. What the tankage imported was actually used for and the chief use of high-grade tankage in California did not establish the chief use of high-grade tankage in the United States. Of course, if it had been proven that most of all high-grade tankage, imported and domestic, was used in California and as a fertilizer, a different case might be presented.

Every intendment must be presumed in favor of the collector's classification, and his classification of the goods covered by the protests under consideration imposed on the importer the burden of proving *that tankage of the grade imported was chiefly used as fertilizer.* The importer did not meet that burden by proving that the high-grade tankage *covered by the protests* was chiefly used as a fertilizer or by proving that high-grade tankage was so used in California.

On the evidence disclosed by the record in this case the judgment of the United States Customs Court must be *affirmed.*