(C. D. 710)

Ignaz Strauss & Co., Inc. *v.* United States

United States Customs Court, Third Division

(Decided December 9, 1942)

*Puckhafer, Rode & Rode* (*Howard C. Carter* of counsel) for the plaintiff.
*Paul P. Rao,* Assistant Attorney General (*Richard H. Welsh, James F. Donnelly,*
and *Daniel G. McGrath,* special attorneys), for the defendant.

Before CLINE, KEEFE, and EKWALL, Judges

CLINE, Judge: This is a suit against the United States in which the plaintiff seeks to recover a part of the duty assessed on certain pewter, enamel, brass, and cloisonné trays. The collector classified the articles as smokers' articles and assessed duty thereon at 60 per centum ad valorem under paragraph 1552 of the Tariff Act of 1930.

The plaintiff makes several claims for lower rates of duty as follows: At 45 per centum ad valorem as articles composed wholly or in chief value of metal, not plated with platinum, gold, or silver, or colored with gold lacquer, under paragraph 397; at 40 per centum ad valorem as "table, household, kitchen, and hospital utensils and hollow or flatware  *  *  *  composed wholly or in chief value of copper, brass, steel, or other base metal, not plated with platinum, gold, or silver" under paragraph 339; at 35 or 25 per centum ad valorem under paragraph 339 as amended by the trade agreement with the United Kingdom (T. D. 49753), the 35 per centum rate applying to the same articles enumerated in paragraph 339 when "composed wholly or in chief value of copper (including copper in alloys other than brass),  *  *  *  and not specially provided for," and the 25 per centum ad valorem rate applying to the same articles when "composed wholly or in chief value of pewter, not plated with platinum, gold, or silver, and not specially provided for."

Some of the articles were assessed with an additional rate of 3 cents per pound on the copper content under the Revenue Act of 1932, but the plaintiff does not challenge that assessment.

At the trial eight official samples, which had been sent to the court by the appraiser, were offered and admitted in evidence. Each article bears a number corresponding to its item number shown on the invoice. The character of the exhibits and their invoice descriptions are as follows:

Exhibit 1 has a round top and the body is in the form of a portion of a globe, having a small round raised standard on the bottom upon which it rests. It is made of a material which looks like brass and a handle of the same material is attached to one side. The diameter of the top is about $2\frac{5}{16}$ inches and the height of the article is about $1\frac{3}{16}$ of an inch, outside dimensions. The invoice description is "No. 5798, Brass trays with handles."

Exhibit 2 is circular, and shaped like a saucer. There is a small round base at the bottom upon which it rests and a narrow strip, which looks like brass, on the edge. The interior has a cloisonné

decoration and the outside is blue, having a few patterns in a brass-colored stripe. Its outside dimensions are about $3^{1}\!/_{16}$ inches in width and about $^{19}\!/_{32}$ of an inch in height. The invoice description is "No. 8467 and 8467/B. Clois. trays on copper, brass finished."

Exhibit 3 is similar to exhibit 2 in size and shape, the only difference being in the decoration. It is invoiced as "No. 11281/BTT and 11281/B, Clois. trays on copper, brass finished."

Exhibit 4 is formed like a miniature soup plate with a rim about $^{5}\!/_{16}$ of an inch in width, which has a slight curve. A base is attached to the bottom upon which the tray rests. The outside width of the article is about 4 inches and the height is about $1^{1}\!/_{16}$ of an inch. The invoice description is "No. 9168 and 9168/TT, Clois. trays on copper, brass finished."

Exhibit 5 is square in shape with sloping sides and a flat bottom upon which it rests. It is decorated on the inside with what appears to be enamel and there is a narrow brass-colored strip on the edge. The diameter is about $2^{13}\!/_{16}$ inches and the height is about $^{5}\!/_{8}$ of an inch, outside dimensions. It is invoiced as "No. 8772, Enamel trays on copper with brass edge."

Exhibit 6 is oblong in shape with a flat bottom and there is a base attached to the bottom upon which the tray rests; the sides are rounded and have a narrow brass-colored strip at the top; there are small indentations at the corners and the interior is decorated with what appears to be enamel. It is about $2^{19}\!/_{32}$ by $3^{5}\!/_{8}$ inches in dimension and the height is about $^{1}\!/_{2}$ of an inch. The invoice description is "No. 786/B, Enamel trays on copper, brass finished."

Exhibit 7–A is a circular tray of the same size and character as exhibits 2 and 3, but the decoration of the interior is different in color. The invoice description is "No. 9005, 100 pairs Clois. trays on copper, brass finished."

Exhibit 7–B, a small black wood standard to fit exhibit 7–A and support it in an upright position, is described on the invoice as "No. 9005/S, 100 pairs wooden rack shape stands." This wooden item is not in issue because it was classified as manufactures of wood and returned for duty at $33^{1}\!/_{3}$ per centum ad valorem under paragraph 412.

Exhibit 8 is of pewter in the shape of a leaf with irregular edges, the central portion being depressed and oval in form; a standard is placed on the bottom to support the tray and there is a short handle which represents the stem of the leaf. The tray is irregular in shape but, exclusive of the handle, the longest outside dimensions are about $4^{5}\!/_{8}$ by $2^{1}\!/_{2}$ inches and it is about $1^{5}\!/_{8}$ inches in height. The invoice description is "No. 8954, Pewter leaf shape tray with stone handle."

There are no cigar or cigarette rests attached to any of the articles.

The parties stipulated that "Exhibits 1 to 7, inclusive, are composed in chief value of copper, and are not plated with platinum,

gold, or silver, or colored with gold lacquer, nor are they iron or steel, enameled or glazed with vitreous glasses" and that "Exhibit 8 is composed in chief value of pewter, not plated with platinum, gold, or silver, or colored with gold lacquer."

The plaintiff called as witnesses Mr. Louis Wasserman, a salesman for the importing firm with 12 years' experience with that firm, Mr. Robert Spilke, a buyer for B. Altman & Co. with 24 years of experience, and Mrs. Bertha Silverman who had formerly been employed as a saleswoman by Alfred Orlik, Inc., for about 5 years. The defendant called Mr. Edmund J. Liepmann who is a classifying clerk in the appraiser's office at New York.

Witness Wasserman testified that items 786 and 786/B are the same, the B indicating that the article has a brass finish, and that the same rule applies to all of the items where an identifying letter is used in connection with the number.

Witnesses Wasserman and Silverman, both of whom were experienced in wholesale selling departments, testified that articles like the exhibits are sold to various department stores and gift shops and that they are sold in the novelty and gift departments of those stores and not in the smokers' departments; that they are sold as trays and, with the exception of articles like exhibits 7–A and 7–B, are used in the homes on the table as mint trays, coasters, nut dishes, and in the bed-rooms, for holding pins, clips, safety pins, etc., and they are also used as ornaments. Witness Wasserman testified also that he had seen articles like all of the exhibits, except 7 and 8, used occasionally as ash trays but that he had seen them "used more often to contain nuts, and mints and pins, and what not". Witness Silverman had never seen merchandise like any of the exhibits used as ash trays.

Both witnesses testified that exhibits 7–A and 7–B have but one use, that is, for display purposes on whatnots, curio cabinets and hanging shelves. Witness Wasserman testified that they are sold in sets consisting of four pieces, that is, two vases and two trays, all on stands. A sample of the set was admitted in evidence and marked illustrative exhibits A–1 to A–8.

Both witnesses testified also that their experience extends back to June 17, 1930, and that the use of all of the articles was the same on that date as indicated by the testimony they had given.

Witness Spilke testified that he had bought and sold many thousands of articles like exhibits 1 to 8 and that they are sold in the oriental and novelty departments of B. Altman & Co. and not in the smokers' goods department; that if a customer came in and asked for ash trays he would show samples like exhibits 1 to 8. Subsequently he testified that he had never handled merchandise like exhibit 1; that he had seen articles like exhibits 2, 3, and 4 used in homes for decorative

purposes, coasters, ash trays, candies, and pins and for rubber bands on desks and "for a thousand other useful purposes"; that the majority of times they would be used as a coaster and an ash tray. When asked which use would predominate, he said:

A. That is difficult to state, because that item as I remember, a great many years ago was originally designed as a coaster, and I don't know of any coaster made that is not used as an ash tray.

The witness testified further that exhibits 5 and 6 are used as ash trays; that he had sold many sets like exhibits 7–A and 7–B for curio purposes. When asked if there is a difference between trays with rests and trays without rests, he said:

A. There is a very great difference between a tray with or without a rest. I should recommend to any customer who comes to the store who wants a practical ash tray to buy an ash tray with a rest. That would eliminate the burning of tablecloths and fire hazard. However, a great many customers do buy ash trays without rests. A great many customers would even buy wooden coasters and use them as ash trays, even though they were impractical, because they liked their appearance.

On cross-examination he testified that onyx ash trays are sold in the smokers' department of the store but 95 per centum of them have grooves in the rims for cigar and cigarette rests, but they do sell in that department ash trays which do not have rests. On redirect examination the witness testified that the trays without grooves and rests which are sold in the smokers' department usually have a rim from one-half to an inch in width.

Witness Liepmann testified that he had been using merchandise similar to all of the exhibits, except number 7, for the last 5 to 8 or 10 years and had seen them used in homes of others for at least 10 years, but he did not state how he had used them or had seen them used. Consequently, his testimony is of no value in determining the use of the articles.

The evidence as to the use of the articles may be briefly summarized as follows: Two witnesses testified that exhibits 1 to 6 and exhibit 8 are chiefly used on the table as coasters or as nut or mint trays and in other rooms as trays for holding pins, clips, safety pins, etc., and that exhibit 7–A, in connection with 7–B, is used only for display purposes in whatnots, curio cabinets, and hanging shelves and that in their experience all of such uses extended back to June 17, 1930. One witness testified that exhibits 2, 3, and 4 are used chiefly either as coasters or as ash trays; that exhibits 5 and 6 are used as ash trays; and that exhibit 7–A, in connection with 7–B, is used only for display purposes in whatnots, curio cabinets, and hanging shelves. The fourth witness testified that he had used articles like all of the exhibits, and had seen others use them, but he did not testify how they were used.

Counsel for the plaintiff urges in his brief that since both paragraphs 339 and 1552 are provisions indicating the use of the articles described therein, the chief use at the time of the enactment of the tariff act is controlling, citing *Wilbur-Ellis Co. et al.* v. *United States*, 18 C. C. P. A. (Customs) 472, T. D. 44762, and *Hawley & Letzerich et al* v. *United States*, 19 C. C. P. A. (Customs) 47, T. D. 44893, and that since the only testimony introduced with respect to the use of the articles at the enactment of the Tariff Act, June 17, 1930, shows that they were chiefly used as articles for use on the table or for the convenience and comfort of members of the household, rather than for use by smokers, they are dutiable as table or household utensils under paragraph 339 or the amendment thereto in the trade agreement with Great Britain.

Counsel for the defendant urges that the plaintiff failed to overcome the presumption of correctness attaching to the collector's decision on the ground that the record fails to show that the goods were chiefly used for other purposes than as smokers' articles throughout the United States at or prior to the enactment of the tariff act, citing *Pacific Guano & Fertilizer Co. et al.* v. *United States*, 15 Ct. Cust. Appls. 218, T. D. 42240. Counsel contends further that, in any event, exhibit 7-A, which the witnesses testified is used merely as an ornament, is not a table, household, kitchen, or hospital utensil within the meaning of that provision in paragraph 339, citing *United States* v. *Friedlaender Co.*, 21 C. C. P. A. (Customs) 103, T. D. 46445.

We are of opinion that the weight of evidence establishes that the articles represented by exhibits 1, 2, 3, 4, 5, 6, and 8 were chiefly used, at the time of the enactment of the Tariff Act of 1930, as utensils for the comfort and convenience of persons in the homes, either on the table or in the rooms of the house, and that the chief use was not as smokers' articles.

In *Friedlaender Co.* v. *United States*, 62 Treas. Dec. 76 T. D. 45814, the merchandise under consideration consisted of various articles classified under paragraphs 399 of the Tariff Act of 1922, and 397 of the Tariff Act of 1930. One of the classes of articles covered by the decision appears to be of the same dutiable character as the articles in exhibits 1, 2, 3, 4, 5, 6, and 8 in this case. They are described on page 78 of that decision as follows:

3. That the bronze and porcelain trays represented by Exhibits 3, 5, and 10 are used in dining and living rooms of homes for serving almonds, mints, etc. We deem of questionable probative value the testimony that these articles could likewise be used as ash trays, especially since cross-examination revealed certain discrepancies in the minds of the witnesses so testifying as to the alleged similarity to the present trays of articles which they had seen used for holding ashes. Also, testimony that the present trays lack the "cigarette rests" invariably found on ash trays is persuasive that these trays were not designed for holding ashes and that they are not so used.

The trial court held that the articles were dutiable as table or household utensils under paragraph 339 of both acts and the judgment of the court in that case was affirmed on appeal. *United States* v. *Friedlaender Co., supra.*

The witnesses called by the plaintiff in this case were fully qualified to give an opinion as to the use of the articles. In *Klipstein* v. *United States*, 1 Ct. Cust. Appls. 122, T. D. 31120, the court said at page 124:

* * * * Importers and merchants are naturally desirous of increasing the number of their customers and the demand for the goods in which they deal, and as they have every incentive for knowing the uses to which their wares are or may be put it is only fair to assume, at least *prima facie*, that the only uses known to them are the only uses of such wares.

The defendant claims, however, that the testimony introduced by the plaintiff is not sufficient to make out a *prima facie* case because the witnesses did not state that they had seen the trays chiefly used for purposes other than as smokers' articles in every section of the United States, relying on the ruling in *Pacific Guano & Fertilizer Co. et al.* v. *United States, supra.* In that case the merchandise consisted of tankage. Some of the imported merchandise had been used as poultry food and some as fertilizer. The plaintiff introduced testimony showing that the chief use of high-grade tankage in California was for fertilizer in the citrus groves, some being used for poultry feed. It was shown also that high-grade tankage produced in the United States by Swift & Co. was all used as hog feed between November 15 and April 1 throughout Kansas, Nebraska, Iowa, Illinois, and the corn belt, and the balance of the year it was shipped to the Southern States of the United States for fertilizer. The appellate court, in affirming the decision of the trial court, said:

The actual use of the *tankage in controversy* and the chief use of high-grade tankage in *California* does not determine the classification of the merchandise. Whether tankage of the *grade* imported was chiefly used as a fertilizer in the United States was the issue presented. What the tankage imported was actually used for and the chief use of high-grade tankage in California did not establish the chief use of high-grade tankage in the United States. Of course, if it had been proven that most of all high-grade tankage, imported and domestic, was used in California and as a fertilizer, a different case might be presented.

On the other hand, in the case of *United States* v. *F. W. Woolworth Co.*, 23 C. C. P. A. (Customs) 98, T. D. 47765, the merchandise before the court was rubber balls which the collector classified as toys on the theory that they were chiefly used for the amusement of children. The testimony before the court was conflicting but the trial court held that the weight of evidence showed that they were beach balls not chiefly used for the amusement of children and held the articles dutiable as balls primarily designed for use in physical exercise under paragraph 1502 of the Tariff Act of 1930. On appeal the Government

contended that the evidence in the record was not sufficient to establish that the articles were not chiefly used for the amusement of children because the experience of the importer's witnesses did not extend throughout the entire territory of the United States. The appellate court affirmed the judgment below. The court said:

> We are not unmindful of the rule that in order to establish "chief use" the evidence of use must relate to the United States generally, and not to a limited portion thereof. It may be proper to observe, however, that the question of whether "chief use" has been properly established depends upon the issues and the evidence in each case.
>
> We think it is a proper deduction from the evidence, and from the character of Exhibits 1, 2, and 3, that the involved articles would be used in substantially the same manner, and by substantially the same class of people, in one section of the country as in another, and that evidence establishing their chief use in a large area of the country is sufficient under the rule.

The plaintiff's witnesses in this case did not testify in what section of the country they had seen the articles in issue used but we are of opinion that the inherent nature of the exhibits indicates that the chief use as testified by the witnesses, as in the *Woolworth Co.* case, *supra*, would be the same in all sections of the country. The use of the tankage in the *Pacific Guano & Fertilizer* case, *supra*, was different in different sections of the country and it would be impossible accurately to determine the chief use of such a commodity unless the use of every pound imported into the United States and produced in this country was proved. We are of opinion that the ruling in the *Woolworth Co.* case, *supra*, is applicable here.

The presumption of correctness of the collector's decision in the instant case disappeared as soon as the plaintiff's witnesses testified that the chief use of the articles in 1930 was other than as smokers' articles. In *United States* v. *The Halle Bros. Co.*, 20 C. C. P. A. (Customs) 281, T. D. 46077, the court, in passing on articles which the collector classified as toys, said at page 283:

> * * *. This presumption, however, disappeared when the testimony of the witness Kathryn Gifford and the sample were placed in evidence before the trial court.

The plaintiff relies chiefly on the claim that the articles are dutiable at 25 per centum ad valorem or at 35 per centum ad valorem under paragraph 339 of the Tariff Act of 1930, as modified by the trade agreement with the United Kingdom which is published in T. D. 49753. That provision reads in part as follows:

> Table, household, kitchen, and hospital utensils, and hollow or flat ware, not specially provided for
>
>     *      *      *      *      *      *      *
>
> Composed wholly or in chief value of copper (including copper in alloys other than brass), not plated with platinum, gold, or silver, and not specially provided for, 35% ad val.

Composed wholly or in chief value of pewter, not plated with platinum, gold, or silver, and not specially provided for, 25% ad val.

The record shows that exhibit 8 is composed "in chief value of pewter, not plated with platinum, gold or silver, or colored with gold lacquer," and, based on our finding that the exhibit is a table or household utensil, we hold that the merchandise represented thereby is dutiable at 25 per centum ad valorem under the provision above quoted.

We note that paragraph 339 of the Tariff Act of 1930 was not modified by the trade agreement so as to withdraw articles composed of brass from that paragraph. The parties in this case agreed that exhibits 1 to 7 are in chief value of copper but the agreement is not sufficient to show that they are made of copper alloys other than brass. One of the items in issue is invoiced as brass trays while the invoice descriptions of some of the other articles contain the words "brass edge" or "brass finished." As the stipulation does not bring the articles within the description of the merchandise assessed at 35 per centum ad valorem in the trade agreement, the claim under that provision is overruled.

Paragraph 339 of the Tariff Act of 1930, however, covers table and household utensils composed of copper or brass, and, as it is shown by the record herein that exhibits 1 to 6 are not plated with platinum, gold, or silver, based on our finding that the articles are table or household utensils, we hold that the merchandise represented by those exhibits is dutiable at 40 per centum ad valorem under paragraph 339 of the Tariff Act of 1930.

There remains for consideration the merchandise represented by exhibit 7 which the witnesses testified has but one use, that is, as an ornament in a curio cabinet, or on a whatnot or a hanging shelf. Counsel for the defendant contends that the exhibit is not a table or household utensil, citing United States v. Friedlaender Co., supra. In that case the court passed upon a variety of articles and affirmed the decision of the United States Customs Court in holding them dutiable as household utensils under paragraph 339. However, the court expressed the following opinion as to whether or not articles having chiefly an ornamental use should be dutiable under that paragraph.

Utilitarian use is not the only criterion. There may be cases in which the ornamental use outweighs the utilitarian use, even though the utilitarian use be a substantial one, and had the testimony in this case shown that ornamental use was the chief use, a different conclusion would be necessary.

In United States v. Ellis Silver Co., 16 Ct. Cust. Appls. 570, T.D. 43297, the court held that certain candlesticks, vases, and other articles, designed for ornamental purposes, were excluded from paragraph 339 of the Tariff Act of 1922. The court said:

The provisions of paragraph 339 [Tariff Act of 1922] are far more comprehensive than those of prior tariff acts. Nevertheless, there is no indication that the Congress intended to extend the scope of the paragraph to include articles other than those having the essential character of utensils. Accordingly, we hold that only such articles as are designed and chiefly used for utilitarian purposes—utensils— are within the provisions for table, household, kitchen, and hospital utensils; and that only such articles as are in the form, generally, of vessels, and are of the character of utensils, designed and used chiefly for utilitarian purposes, are included within the provisions for hollow ware.

Many of the involved articles are obviously within the provisions for hollow ware. Those denominated in the record as candlesticks, chamber candlesticks, candelabras, storm candlesticks, photo frames, and vases, due to the fact that they are evidently designed for ornamental purposes, and as there is no evidence of their chief use, must be held to be excluded from the paragraph. The record and the exhibits are in such a state that we are unable to say with any degree of certainty that other of the involved articles should be excluded from the paragraph.

From a review of that decision it seems to appear that the court considered that the provision for household utensils was limited to hollow ware, but in a subsequent decision (*Frank P. Dow Co., Inc.* v. *United States*, 21 C. C. P. A. (Customs) 282, T. D. 46816) in which the merchandise consisted of vacuum cleaners and floor polishers classified by the collector under paragraph 339 of the Tariff Act of 1922, the court, in sustaining that classification, after reviewing the legislative history of the provision, said at page 289:

It is made clear by the explanation of the Senate amendment contained in the conference report, that our holding in the *Ellis Silver Co.*, and *Friedlaender Co.*, cases, to the effect that it was the intention of the Congress to limit the provisions for hollow or flat ware to articles "designed and used chiefly for utilitarian purposes," was erroneous.

Subsequent to the promulgation of the above decision many articles which are in the nature of a utensil have been held dutiable under paragraph 339, such as atomizers (*I. W. Rice & Co.* v. *United States*, 24 C. C. P. A. (Customs) 114, T. D. 48415), small metal figures of animals to which chains were attached for connecting the figures to pencils to be used on bridge tables (*F. W. Woolworth Co.* v. *United States*, 26 C. C. P. A. (Customs) 221, C. A. D. 20), silver-plated metal stands for holding place cards at the dining table (*United Bead Corp.* v. *United States*, 68 Treas. Dec. 830, T. D. 48043), bird cages (*Heemsoth & Basse* v. *United States*, 72 Treas. Dec. 385, T. D. 49191), perfume bottles with metal caps (*Viking Trading Co.* v. *United States*, 2 U. S. Cust. Ct. 237, C. D. 132).

No case has been brought to our attention where articles used purely for ornamental purposes have been held dutiable as household utensils. In *N. Shure Co.* v. *United States*, 63 Treas. Dec. 1306, Abstract 23111, the following appears:

* * *. In view of the testimony that the articles in question are used only for decorative purposes, they were found not to be household utensils within the meaning of paragraph 339.

The goods in that case, which consisted of cloisonné ware, were held by the trial court to be dutiable at 45 per centum ad valorem, as articles composed of metal, under paragraph 397 of the Tariff Act of 1930. That decision was reversed by the appellate court but the only question argued was whether or not the merchandise was gold-plated. The appellate court held that the merchandise was gold-plated and therefore dutiable at 65 per centum ad valorem, as classified by the collector, under either paragraph 339 or 397. *United States* v. *N. Shure Co.*, 21 C. C. P. A. (Customs) 296, T. D. 46818.

It is urged by the plaintiff that the bird cages in *Heemsoth & Basse* v. *United States, supra,* were used for decorative purposes only We can not agree with that contention. Bird cages are manifestly utensils used for holding a bird just as the metal stands for holding place cards on a dining table are utensils.

We are of opinion that the merchandise represented by exhibit 7-A, which the record shows is used solely for ornamental purposes in curio cabinets or on whatnots or hanging shelves in the home, is neither utensils nor smokers' articles. We hold said merchandise dutiable at 45 per centum ad valorem as articles composed wholly or in chief value of copper, not plated with platinum, gold, or silver, or colored with gold lacquer, under paragraph 397.

Judgment will be entered in favor of the plaintiff insofar as the protest relates to the merchandise represented by exhibits 1 to 8 and said merchandise is held dutiable at the ad valorem rates of 25, 40, and 45 per centum as above indicated.

As to all other merchandise assessed at 60 per centum ad valorem and in all other respects, the protest is overruled.