No. 61051.—C. F. Liebert *v.* United States, protest 291216–K (Seattle).

FORD, Judge: The suit listed above challenges the action of the collector of customs in classifying certain imported merchandise as "Machines, N. S. P. F., other (Mink food grinding machines)" and levying duty thereon "under Par. 372, T. A. 1930, as amended" at the rate of 13¾ percent ad valorem. There was also included in the importation certain spare knives for one of these machines, which were classified as all other cutting knives used in a power machine, and duty was levied thereon at the rate of 10 percent ad valorem under paragraph 356 of said act, as modified by the Torquay Protocol to the General Agreement on Tariffs

and Trade, 86 Treas. Dec. 121, T. D. 52739. Plaintiff claims said merchandise to be entitled to entry free of duty under paragraph 1604 of said act, which is in part as follows:

PAR. 1604. Agricultural implements: * * * of any kind or description, not specially provided for, whether in whole or in parts, including repair parts: *Provided,* That no article specified by name in Title I shall be free of duty under this paragraph.

At the trial of this case, counsel for the plaintiff offered the testimony of one witness, who testified that he was plant superintendent for the Northwest Fur Breeder's Cooperative Association, which association prepares feed for mink farmers and breeders throughout the States of Washington, Oregon, and Idaho; that said association has approximately 200 members in Washington, Oregon, Idaho, Montana, Utah, and Colorado; that the machines in question are constructed of "* * * quarter inch steel, it is all steel and it has several parts, a worm, two knives, two plates, one inner and outer."

Explaining further the operation of these machines, the witness stated:

On the top of this grinder they have a hopper which I forgot to mention, the fish all go into the hopper and fall down into the worm and the worm turning pushes the fish right out through the knives and the blades and the fish comes out in pieces.

The witness testified that the majority of these machines had been sold in the States of Washington, two in Oregon, and one in Montana; that the association handled somewhere in the neighborhood of 15 machines altogether; that he had nothing to do with the purchase or sale of these machines, but that he knew each of the farmers who bought them; that all of the machines the association imported were put to the same type of use by the mink farmers in grinding fish to be fed to mink.

Upon recross-examination, the witness was interrogated and testified as follows:

R. X Q. Am I correct in understanding that your knowledge of the use of these machines is limited to the people to whom your firm sold these machines?—A. That's right.

R. X Q. Does that embrace the states of Washington, Utah, Oregon and Colorado?—A. Only three states, Washington, Oregon and Montana.

R. X Q. And those are the three states that you know of having heard as to the use of them?—A. Yes, well, no, you asked me if those were the only states.

R. X Q. That you heard of their use as the result of your firm selling them?—A. All the members in the Northwest Fur Breeder's Association throughout the several states that we are in know about these grinders.

R. X Q. I am interested in what you know, not the members, I am interested in knowing what you know and that is limited to those states in which you were told these machines were sold, is that correct?—A. Yes.

Based upon the foregoing testimony, counsel for the plaintiff, in his brief filed herein, contends that it has brought the subject machines within the provisions of said paragraph 1604 and that they are, therefore, entitled to entry free of duty. With this contention we cannot agree.

While the testimony shows that the approximately 15 machines imported by the plaintiff herein were chiefly used by mink farmers to grind fish to be fed to mink, there is no showing that hundreds of such or similar machines were not imported into the states mentioned by the witness and used for purposes other than agriculture. Nor is there any evidence to the effect that the States of Washington, Oregon, Montana, and Utah constitute the principal mink growing section of the United States. This lack of proof we feel is fatal to plaintiff's case.

In *United States* v. *Spreckels Creameries, Inc.,* 17 C. C. P. A. (Customs) 400, T. D. 43835, a witness for the appellee testified as follows regarding certain cans there involved:

Q. Have you noticed whether or not the farmers or ranchers make any use of these 10-gallon cans on the farm itself?—A. Part of them do.

Q. What do you mean by that answer?—A. If the man having the dairy, and he milks the cows in the barn, he has a milk house, where from the barn he uses the cans to transport his milk over to the part where he stores milk and cream.

Q. Is there any secret [we assume this is a typographical error and that the word should be "separate"] use for cans of this sort, except those uses you have told us about?—A. On the farm.

Commenting upon the foregoing testimony, the court said:

Manifestly this proof is insufficient to show that this particular type of use is the chief use, and we do not understand appellee to really so insist. Its principal insistence is that the use by the so-called cooperative creameries is chief use, and that since these are organizations composed of farmers it constitutes an agricultural use which justifies the classification of the cans as agricultural implements.

\* \* \* \* \* \* \*

It may be further stated that even the transportation used by cooperative creameries shown by the testimony is limited to a section of the State of California, and this, under the doctrine declared by us in *Pacific Guano & Fertilizer Co. et al.* v. *United States,* 15 Ct. Cust. Appls. 218, 228, T. D. 42240, would not be sufficient. We there said:

> The actual use of the tankage in controversy and the chief use of high-grade tankage in California does not determine the classification of the merchandise. Whether tankage of the grade imported was chiefly used as a fertilizer in the United States was the issue presented. What the tankage imported was actually used for and the chief use of high-grade tankage in California did not establish the chief use of high-grade tankage in the United States. Of course, if it had been proven that most of all high-grade tankage, imported and domestic, was used in California and as a fertilizer, a different case might be presented.

We do not think, therefore, that there is satisfactory evidence in the record to show a character of chief use which entitles the milk cans in question to classification under paragraph 1504 as agricultural implements, and the finding of the Customs Court to this effect is not supported by the testimony.

It is our view that the classification of the involved machines is controlled by the doctrine declared in the *Spreckles* case, *supra,* and that the evidence herein is not sufficient to establish a *prima facie* case for the plaintiff.

In view of the fact, however, that "food cutting or grinding machines" are excepted from the provisions of said paragraph 372, as modified, *supra,* all claims in the protest are overruled, without approving the classification of the collector, except as to the cutting knives. Judgment will be rendered accordingly.