(C.D. 2636)

Mitsui & Co., Ltd. *v.* United States

United States Customs Court, First Division

(Decided March 24, 1966)

*Glad & Tuttle* (*Edward N. Glad* of counsel) for the plaintiff.
*John W. Douglas*, Assistant Attorney General (*Mollie Strum* and *Arthur H. Steinberg*, trial attorneys), for the defendant.

Before OLIVER, WILSON, and NICHOLS, Judges

NICHOLS, Judge: The merchandise involved in these cases, consolidated at the trial, is described on the invoices as Japanese oak mosaic flooring or as oak mosaic flooring, "5/16″ x 18″ x 18″ (consisted from 16 sheets of 4½″ square composed of 5 pcs. of slat)." It was imported from Japan on various dates between January 1961 and March 1962 and was assessed with duty at 16⅔ per centum ad valorem under paragraph 412 of the Tariff Act of 1930, as modified by the Annecy Protocol of Terms of Accession to the General Agreement on Tariffs and Trade, T.D. 52373 and T.D. 52476, as manufactures wholly or in chief value of wood, not specially provided for. It is claimed that the merchandise is properly dutiable at 7½ per centum ad valorem under paragraph 404, as modified by the Protocol of Terms of Accession by Japan to the General Agreement on Tariffs and Trade, T.D. 53865 and T.D. 53877, as flooring of Japanese white oak.

The pertinent provisions of the tariff act, as modified, are as follows:

[Par. 412, as modified by T.D. 52373 and T.D. 52476.]   Manufactures of wood or bark, or of which wood or bark is the component material of chief value, not special provided for:

| * | * | * | * | * | * | * |

    Other (except * * *) _____ 16⅔% ad val.

[Par. 404, as modified by T.D. 53865 and T.D. 53877.]
Japanese white oak and Japanese maple, in the form of sawed boards, planks, deals, and all other forms not further manufactured than sawed, and flooring__   7½% ad val.

At the trial, Harry F. Hatch testified that he has been in the importing business for 11 years, the last 4 as a sole proprietor. He imports building material, including nails, parquet flooring, wire, netting, steel, sheet, and plate, and sells such items principally in the 11 Western States. He has been handling flooring for about 4 years, solely Japanese white oak and parquet flooring. He is familiar with the material covered by the invoices herein and knows it as oak mosaic flooring, oak parquet flooring, or Japanese white oak parquet flooring, which he said were interchangeable definitions. He has become familiar with the uses of this material through his experience in selling nails to firms which are wholesalers of flooring, flooring supplies, and equipment, through whom he learned of a potential market for this type of flooring.

A sample of the merchandise was received in evidence as plaintiff's exhibit 1, and the witness stated that it was imported "exactly as you see it here, in this pattern, and glued to a paper backing." Unfortunately, the paper has become torn and most of the pieces are no longer glued to it. The sample consists of numerous pieces of wood $4\frac{1}{2}$ inches long, $\frac{3}{8}$ of an inch wide, and $\frac{5}{16}$ of an inch thick. Of those still glued to the paper, some are horizontal and some are vertical. From the sample and the invoice description, it would appear that the blocks are glued to the paper in $4\frac{1}{2}$-inch squares of five pieces each so as to form an 18- by 18-inch square in patterns of smaller squares of horizontal and vertical blocks.

The witness stated that this material is used on a cement slab or on a subflooring, generally of plywood. He described the method of application as follows:

You first put a mastic or adhesive on the plywood surface. This is speaking of a use on sub-flooring. You put an adhesive or a mastic, as it is known in the trade. Then the pattern is placed face down in this mastic, with the paper backing up. It is smoothed out to set it into the mastic, and then the pattern is allowed to sit in this mastic until it is set, hardened, and then the paper is moistened and peeled off, and then it is finished.

Many patterns have to be used to cover the entire floor. Application to a cement slab is done the same way. No nails are used. After the paper is removed, the flooring must be gone over with a commercial sanding machine several times depending on how fine a finish is desired. Then the flooring is filled with a commercial wood filler and a finishing coat applied, which may be varnish, synthetic finish, penetrating sealer, or lacquer-base finish.

The witness stated that the material is used for flooring, principally in the interior of homes, and that he had never seen or heard of it being used commercially for anything other than flooring. It would be physically possible to glue it to a wall but it would be an unsatis-

factory method of producing a wall finish because of the cost. "You'd have to use a sander that could be held in the hand." The witness never sold it as anything but flooring.

The sample was sent to the customs laboratory in Los Angeles to determine whether or not it was Japanese white oak. On the return of the analysis, it was stipulated that the report read as follows:

The sample has the physical and the microscopic anatomical charac- teristics of Japanese White Oak. It is not made from Quercus alba.

On the record presented, plaintiff claims that the material has been shown to be restricted by its shaping to use only in making floors in homes on which the inmates walk and which support the movable articles of furniture and is, therefore, flooring. Defendant contends that the provision for flooring in paragraph 404, *supra*, is based on use, and that the record has not established that the chief use of the imported merchandise is as flooring throughout the United States.

The terms "flooring" and "floor" have been defined as follows:

Webster's New International Dictionary, 1958 edition:

flooring, a A platform, floor, or pavement. b Material for a floor or floors (sense 1).

floor, 1. The bottom or lower part of any room; the part of a room upon which one stands.

Funk & Wagnalls New Standard Dictionary, 1956 edition:

flooring, 1. Material from which to make a floor.

floor, 1. The bottom surface in a room or building, on which the inmates walk, and which supports the movable articles of furniture, etc.: usually constructed of boards, or planks, but sometimes of tiles or bricks, or of iron or other metal.

Consideration of the issue of chief use will dispose of the protests, and other issues covered in the briefs are, therefore, passed over.

It is evident that for us to sustain the claimed classification, we would have to find that the imported merchandise is chiefly used for making floors. We cannot so find. The witness' knowledge is limited to the "eleven Western states," whichever ones they are; clearly they are not a cross section of the United States. There is nothing to show that sales of material of the type here involved, or of the same class or kind, are limited to those states. Counsel attempted to show that it was impractical to use the merchandise on walls, but nothing was said about other possible uses. Even as to walls, the inference plaintiff wants us to draw is too speculative. It would have us assume that, on walls, the articles would still have to be sanded just as on floors, and that on walls, only hand sanders could be used, which would be too expensive. It is tempting to say that we ourselves have seen these

articles used only on floors, but this is not a proper answer. It may be appropriate at times, to resort to some judicial notice merely in determining what proof is necessary to show that a use is the chief one. Here we know "judicially" that architecture and décor vary widely in different parts of the country, for reasons of climate and also taste. Therefore, it would be more dangerous with building materials than with almost anything else, to accept chief use in one section as proof of chief use nationwide. The general rule is that chief use must be shown by positive testimony covering an "adequate geographical cross section of the country." *L. Tobert Co., Inc., American Shipping Co.* v. *United States*, 41 CCPA 161, 164, C.A.D. 544, and chief use in one state or section is not enough. *Pacific Guano & Fertilizer Co. et al.* v. *United States*, 15 Ct. Cust. Appls. 218, T.D. 42240; *United States* v. *Spreckels Creameries, Inc.*, 17 CCPA 400, T.D. 43835. Common sense may suggest exceptions at times: thus, if an article and those of the same class or kind are shown to be marketed only in one section, evidence of chief use in other sections clearly would have to be dispensed with. There may be articles having only one possible use. Here, if Japanese white oak products, such as those at bar, were marketed only in the "eleven Western states" the problem of proof would be, for plaintiff, simplified. So would it be, if it really were proved to be impracticable to use these articles except on floors. We must decide the case as it is presented to us, and if this decision is cited as a precedent, consideration must be given to the record that was before us.

The record presented does not sustain plaintiff's claim, and, accordingly, the protests must be overruled and judgment rendered for the defendant.