**No. 58797.**—California Wool Growers Assn. and Frank P. Dow Co., Inc. *v.* United States, protest 212397–K (San Francisco).

FORD, Judge: The suit listed above involves the question of the proper classification of certain imported merchandise described on the invoice as "Burdizzo Secateurs" and "Hoof Knives." It appears that the secateurs were classified as shears, not sheep shears, under paragraph 357 of the Tariff Act of 1930, as modified by the Annecy Protocol of the Terms of Accession to the General Agreement on Tariffs and Trade, 84 Treas. Dec. 403, T. D. 52373, supplemented by Presidential proclamation, 85 Treas. Dec. 138, T. D. 52476, and duty was levied thereon at the rate of 15 cents each and 35 per centum ad valorem. It further appears that the hoof knives were classified as similar knives to those specified by name in paragraph 355, as modified, *supra*, less than 4 inches in length, exclusive of the handle, and duty was levied thereon at the rate of 2 cents each and 12½ per centum ad valorem.

Plaintiffs claim said merchandise to be properly dutiable at 45 per centum ad valorem under paragraph 359 of said act, as modified by T. D. 52373, *supra*, supplemented by Presidential proclamation, 85 Treas. Dec. 116, T. D. 52462, as surgical instruments, or entitled to free entry under paragraph 1604 of said act as agricultural implements.

The record contains no evidence tending to establish that the involved merchandise should be classified as surgical instruments under said paragraph 359, and no reference to said claim is contained in the brief of counsel for the plaintiffs. In *Stan Newcomb and Barbara Todd* v. *United States*, 37 C. C. P. A. (Customs) 18, C. A. D. 413, it was stated:

One of the assignments of error by appellants is the denial by the trial court of their motion for a rehearing. If it were sustained, the case would be remanded without any discussion by us of other questions. Hence, it is proper that it be disposed of at this point.

Appellants' brief makes no reference whatever to the assignment nor was it discussed at the oral hearing. Consequently, we regard it as having been abandoned. *United States* v. *Joseph G. Brenner Co.*, 19 C. C. P. A. (Customs) 105, 107, T. D. 45243; *United States* v. *Fung Chong Co.*, 34 C. C. P. A. (Customs) 41, 45, C. A. D. 342. See also *In re Valko et al.*, 36 C. C. P. A. (Patents) 899, 173 F. (2d) 275, 81 USPQ 102; *In re Henze*, 36 C. C. P. A. (Patents) 1038, 173 F. (2d) 997, 81 USPQ 398. In the case of *Caldwell* v. *Standard Accident Insurance Co.*, 98 F. (2d) 364, the United States Circuit Court of Appeals of the Sixth Circuit dismissed one of two appeals because Caldwell was held to have abandoned his appeal by failing to press his assignments of error either in brief or in oral argument. In the Fifth Decennial Digest (American Digest System 1936 to 1946) Vol. 3, beginning at page 1724, Section 1078, is given a long list of cases decided in State courts and in the courts of the District of Columbia, holding that an assignment of error not argued in briefs nor orally will not be considered.

No further consideration or action is required by us on this particular assignment of error.

To the same purport, is the following from *Marianao Sugar Trading Corp.* v. *United States*, 41 C. C. P. A. (Customs) 236, C. A. D. 557:

The appellant's claim (Protest 141159–K) that it was entitled to the reduction of 20 percent in accordance with the Cuban Trade Agreement of 1934, *supra*, was not affirmatively argued, either orally or in its brief, and thus appears to have been abandoned. Discussion thereon is accordingly unnecessary. See *Stan Newcomb and Barbara Todd* v. *United States*, 37 C. C. P. A. (Customs) 18, C. A. D. 413.

In harmony with the foregoing authorities, we treat the claim of plaintiffs under paragraph 359 of the Tariff Act of 1930 as having been abandoned.

Samples of the two items of merchandise here involved are in evidence, the foot rot shears being marked exhibit 1, and the hoof knife being marked exhibit 4. Exhibit 2 is a page from a catalog illustrative of the involved hoof knife. Exhibit 3 is a pamphlet issued by the California Stockmen's Supply Co. on the control and treatment of foot rot and explains the use of exhibit 1. Exhibit 5 is entitled "Stockmen's Supplies, Catalog No. 53," page 35 of which is a duplicate of exhibit 2.

John D. Wilson, vice president and sales manager of the California Stockmen's Supply Co., testified that the nature of his work includes promotion and sales of ranch and veterinary supplies and all types of insecticides; that exhibit 1 is used to pare out the infected parts within the hoof or foot of cattle or sheep, and is used by cattlemen and sheepmen and their employees and agents and also by veterinarians. "It is designed for a specific purpose because it has sharp double bitted blades that are pointed, designed for digging out pockets of infection." The witness explained the use of exhibit 2, the hoof knife, as follows:

It is used for the same purpose as the secateur in paring away diseased parts of the hoof, opening the pockets of infection so that they can be treated with germicide or other type of treatment. It is particularly designed for this particular purpose.

The witness further testified that very little instruction is required in order to be able to use the foot rot shears or hoof knives—"just one practical demonstration." He also testified that a farrier's knife "is a horse shoer's knife. It is similar to this except it is considerably larger. * * * It is similar in shape and design," reference being made to exhibit 2; that—

Sheep shears are designed for cutting wool; in other words, taking the fleece from the animal. They have a long thin blade usually 6 and a half or 7 inch blade. The design is entirely different. They would not be adaptable for this type of work. Similarly, secateurs could not be used for shearing the wool from the sheep.

The witness also testified that he had never seen exhibit 1, the foot rot shears, used for anything like cutting grass, or any purpose, other than as heretofore described, and that:

There are many stores that sell a line of feed to stockmen. Invariably, they carry a line of remedies, antibiotics, tonics and many of them carry a few of the more popular little instruments.

Judge Ford: Mr. Wilson, referring for a moment again to Exhibits 1 and 4, who did you say that this merchandise is usually sold to?

The Witness: I stated that we sell on two different levels. We call wholesaler-dealer levels which we sell to our dealer accounts, veterinarians, veterinarian supply stores, drug stores who carry a veterinary supply section; feed stores.

Judge Ford: Are you referring to the State of California or are you referring to the United States?

The Witness: United States.

Judge Ford: You have made sales on that basis throughout the United States?

The Witness: Yes, we have—approximately 1400 dealer accounts scattered all over the United States.

Judge Ford: In every State?

The Witness: We have customers in every State. I am not sure whether they might be in Florida, whether they might be a dealer or a retailer as well as Canada and Mexico.

Judge Ford: Do you know of your own knowledge that the uses were the same as the uses which you mentioned?

THE WITNESS: They are sold for that purpose but I have not followed them up or seen them used in any other State except California.

\*     \*     \*     \*     \*     \*     \*

R. X Q. You say you have never seen them used outside of California?—A. No. I have spent very little time outside of California in the last ten years.

With reference to exhibit 5, the witness was interrogated and answered as follows:

R. X Q. Mr. Wilson, to whom did you or do you send these catalogs?—A. We send one catalog together with a dealer discount sheet to each of our approximately 1400 wholesale accounts. We mail——

JUDGE FORD: Located throughout the United States?

THE WITNESS: Yes. We mail somewhere between 16 or 17 thousand to our retail customers and prospective customers. We use some of them for handouts at meetings; livestock shows or wherever we might have an exhibit.

\*     \*     \*     \*     \*     \*     \*

R. X Q. What states don't you send them to, do you know?—A. We send them to all the states in the United States.

R. X Q. Do you have customers in every state in the United States?—A. Yes.

\*     \*     \*     \*     \*     \*     \*

R. X Q. What class of individual chiefly uses the catalog which you refer to?—A. You mean the products within the catalog?

R. X Q. Well, it would have to be the products; people who use the products would refer to the catalog, is that correct?—A. Veterinarians, all of those that I have mentioned; there's our dealer accounts, plus dairymen, beef cattlemen, hogmen, sheepmen, and to a limited extent horsemen and poultrymen.

The provisions of paragraph 355 and 357, as modified, *supra*, under which the merchandise was classified, are as follows:

[355] Table, butcher's, carving, cooks', hunting, kitchen, bread, cake, pie, slicing, cigar, butter, vegetable, fruit, cheese, canning, fish, carpenters', bench, curriers', drawing, farriers' fleshing, hay, sugar-beet, beet-topping, tanners', plumbers', painters', palette, artists', shoe, and similar knives, forks, and steels, and cleavers, all the foregoing, finished or unfinished, nspf:

\*     \*     \*     \*     \*     \*     \*

With handles of wood or wood and steel:
If specially designed for other than household, kitchen, or butchers' use:
If less than 4 inches in length, exclusive of handle_____ 2¢ each and 12½% ad val.

[357] All scissors and shears (not including pruning shears or sheep shears), and blades for the same, finished or unfinished:

Valued at more than $1.75 per dozen_____ 15¢ each and 35% ad val.

Paragraph 1604 of the Tariff Act of 1930, under which the merchandise is claimed to be free of duty, is as follows:

Agricultural implements: Plows, tooth or disk harrows, headers, harvesters, \* \* \* and all other agricultural implements of any kind or description, not specially provided for, whether in whole or in parts, including repair parts: *Provided,* That no article specified by name in Title I shall be free of duty under this paragraph.

The first question to be considered in this case is whether or not the evidence offered by the plaintiffs is sufficient to establish that the involved merchandise is agricultural implements. There is no question about the two items involved being implements, but are they agricultural implements? This question is answered

only by proof of the chief use of the articles, whether or not in agriculture. The evidence on this point by the only witness testifying is that the merchandise is sold in every state in the United States to its dealer accounts, veterinarians, veterinary supply stores, drug stores, and to feed stores. However, the witness admitted quite frankly, when asked if he knew of his own knowledge that the uses were the same as the uses to which he had testified, that "They are sold for that purpose but I have not followed them up or seen them used in any other state except California."

In the absence of testimony showing that California is the chief sheep growing center of the United States, the above testimony falls far short of establishing that the two articles here involved were chiefly used in an agricultural pursuit.

In *United States* v. *Spreckles Creameries, Inc.*, 17 C. C. P. A. (Customs) 400, T. D. 43835, involving the proper classification of cylindrical metal 10-gallon cans intended for use in the transportation of milk, the Court of Customs and Patent Appeals held as follows:

It is manifest that the foregoing testimony is not sufficient to establish the fact that the chief use of these milk cans is upon the farm or by farmers, nor is it sufficient even to show that chief use is for transportation by cooperative creamery organizations composed of farmers.

The appellee creamery company is not itself engaged in agriculture, but in processing an agricultural product, and the chief use satisfactorily shown by the evidence in the case is only that by appellee, which we do not think can be declared agricultural in its nature.

We are not, therefore, presented with a case wherein there is shown chief use either by individual farmers on the farm itself or by organizations of farmers for transportation. Nor does it appear that the chief use is made up of a combination of use on the farm and transportation by farmers' organizations.

It may be further stated that even the transportation used by cooperative creameries shown by the testimony is limited to a section of the State of California, and this, under the doctrine declared by us in *Pacific Guano & Fertilizer Co. et al.* v. *United States*, 15 Ct. Cust. Appls. 218, 228, T. D. 42240, would not be sufficient. We there said:

The actual use of the tankage in controversy and the chief use of high-grade tankage in California does not determine the classification of the merchandise. Whether tankage of the grade imported was chiefly used as a fertilizer in the United States was the issue presented. What the tankage imported was actually used for and the chief use of high-grade tankage in California did not establish the chief use of high-grade tankage in the United States. Of course, if it had been proven that most of all high-grade tankage, imported and domestic, was used in California and as a fertilizer, a different case might be presented.

We do not think, therefore, that there is satisfactory evidence in the record to show a character of chief use which entitles the milk cans in question to classification under paragraph 1504 as agricultural implements, and the finding of the Customs Court to this effect is not supported by the testimony.

We are not unmindful of the fact that in *United States* v. *S. S. Perry*, 25 C. C. P. A. (Customs) 282, T. D. 49395, the Court of Customs and Patent Appeals held that the testimony of one witness was sufficient to establish chief use of the merchandise there involved. However, it is to be noted that the witness in that case testified that the principal poultry center of the United States was comprised of the States of California, Oregon, and Washington and that he was familiar with the use of the merchandise in that area. In the instant case, we have no such testimony. We must, therefore, conclude from the record before us that the plaintiffs have failed to establish that the involved merchandise is of a kind or class which was, at and immediately prior to the passage of the Tariff Act of 1930, used chiefly in an agricultural pursuit. This being true, it is not necessary for

us to determine whether or not the involved merchandise is specified by name in title I of the Tariff Act of 1930.

For the reasons stated, all of plaintiffs' claims are overruled. Judgment will be rendered accordingly.