(C.D. 2183)

MOHNS COMMERCIAL COMPANY *v.* UNITED STATES

United States Customs Court, Second Division

(Decided June 6, 1960)

*Lawrence & Tuttle* (*Barnes, Richardson & Colburn* by *George R. Tuttle, Jr., Dan Erik Hedin*, and *Edward N. Glad* of counsel) for the plaintiff.

*George Cochran Doub*, Assistant Attorney General (*William J. Vitale, Murray Sklaroff, Sheila N. Ziff*, and *Alfred A. Taylor, Jr.*, trial attorneys), for the defendant.

Before LAWRENCE, RAO, and FORD, Judges; LAWRENCE, J., not participating

FORD, Judge: Certain gate valves, with nonrising stems, having a working pressure of 125 pounds per square inch in sizes of 3 inches, 4 inches, 5 inches, 6 inches, and 8 inches, were assessed with duty at the rate of 22½ per centum ad valorem and classified by the collector of customs under paragraph 397 of the Tariff Act of 1930, as modified by the General Agreement on Tariffs and Trade, 82 Treas. Dec. 305, T.D. 51802, which provides as follows:

Articles or wares not specially provided for, whether partly or wholly manufactured:

| \* | \* | \* | \* | \* | \* | \* |

Composed wholly or in chief value of iron, steel, lead, copper, brass, nickel, pewter, zinc, aluminum, or other metal (not including platinum, gold, or silver), but not plated with platinum, gold, or silver, or colored with gold lacquer:

| \* | \* | \* | \* | \* | \* | \* |

Other \* \* \*_____ 22½% ad val.

By its protest, as originally filed, plaintiff claims the merchandise to be entitled to entry free of duty pursuant to the terms of paragraph 1604 of the Tariff Act of 1930, which, so far as pertinent herein, provides as follows:

Agricultural implements: \* \* \*, and all other agricultural implements of any kind or description, not specially provided for, whether in whole or in parts, including repair parts: *Provided*, That no article specified by name in Title I shall be free of duty under this paragraph.

By timely amendment, plaintiff alternatively claims the merchandise to be properly dutiable at the rate of 13¾ per centum ad valorem under the provisions of paragraph 372 of the Tariff Act of 1930, as modified by the Torquay Protocol to the General Agreement on Tariffs and Trade, 86 Treas. Dec. 121, T.D. 52739, for machines. No

evidence having been adduced and the claim not having been pressed, it is, therefore, deemed abandoned.

The record in this case consists of the testimony of four witnesses called on behalf of plaintiff and three witnesses called on behalf of defendant, whose testimony was adduced at hearings at four different ports. In addition thereto, four exhibits, two on behalf of plaintiff and two on behalf of defendant, were received in evidence.

Mr. Heinz Schmidt, the owner of plaintiff company, testified that he was familiar with the items of merchandise before the court since he had them made especially for irrigation purposes and started importing them in 1935; that the merchandise came into existence by virtue of requests from his customers for a light valve with low water pressure to be used for irrigation purposes; that exhibit 1 was a representative sample of the imported merchandise, except that the flange was broken from the body; that the term "nonrising stem" meant the stem rises on the inside of the valve; that he has imported small brass and bronze valves but no cast-iron valves other than the merchandise now before the court.

The witness then testified that this merchandise was sold to the Pacific Pipe Co. in San Francisco, to the Smith-Scott Co. in Riverside who is an irrigation distributor, to a few customers in the Northwest, and the Metropolitan Valve Supply Co. in Brooklyn, N.Y.; that, in addition, pipe valves were also sold to the El Paso Pipe Co. in El Paso, Tex.; that, occasionally, small shipments were made to some irrigation companies in the Northwest Pacific and Middle West; that he did not deal in industrial valves; that the merchandise was sold to wholesale distributors for irrigation equipment and pipe companies; that he had not seen how they were used by the ultimate consumer.

Mr. Schmidt then described the operation of the valve to the extent that upon turning the wheel on top of exhibit 1, the gate inside moves up or down and when the gate is up the water flows freely. The witness further stated that the opening or closing of the valve is done by hand and that otherwise said valve has no moving parts.

Plaintiff next called upon Mr. Gudelj, a sales manager of Pacific Pipe Co., who testified that he has been in the business of selling pipes, valves, and fittings for about 30 years; that his firm sells valves to oil refining companies, gas companies, water companies, and dealers in the irrigation business, which includes well drillers, pump installers, and sellers of irrigation pipes and pumps; that he is familiar with merchandise such as exhibit 1 which he sells for irrigation purposes; that, in his opinion, it is not suitable for use in steam, gasoline, or any hazardous item due to its light weight and low pressure rate. The witness then described the operation of the valve and stated that the valve seat in exhibit 1 was pressed in rather than screwed in as was the usual practice; that, in his opinion, it

would be extremely hazardous to use such a valve for anything besides water since the seat could become detached; that the valve was not a new type of valve in general construction but it was a lighter type of valve than had ever been on the market; that a majority of the valves sold by his company would be used on standpipes and portable irrigation systems. Mr. Gudelj described a portable irrigation system as an aluminum pipe that was moved from place to place in a field with a revolving sprinkler, and that, in many cases, permanent underground mains with standpipes at regular intervals, having a valve such as the valve herein, came out of the ground for the purpose of enabling the attachment of portable irrigation systems.

On cross-examination, the witness testified that he would not personally recommend the use of exhibit 1 in a city water-supply system and that 90 per centum of the municipalities would insist upon valves complying with the specifications of an American Water Works Association, which had set particular standards for valves; that he had never seen these valves in operation.

The general manager of Smith-Scott Co., Mr. Smith, whose business is the sale of lightweight steel pipe, valves, and fittings, testified that, in 1955, it began to handle an article such as exhibit 1; that, prior to 1955, his company had been rebuilding used valves of domestic manufacture; that the imported merchandise consisted of lightweight valves designed for low pressure which could readily be utilized with the lightweight pipe sold by his organization; that the domestic valves were at least twice as heavy as the imported valves and capable of withstanding "tougher" service.

The witness testified that he was familiar with exhibit 1 as it was originally sold by his company as indicated by the nameplate contained thereon; that said valve was broken in the course of service in an avocado grove in Fall Brook, San Diego County, Calif.; that it was attached to the end of a steel line at the beginning of a plastic line to enable the water to be turned off at that point and that said lines were used for irrigation of the avocado grove; that he has tried to sell the involved valves exclusively to agricultural dealers and that at least two-thirds of them have gone to said dealers; that he believed these dealers to be agricultural suppliers, since they handled tractors, farm implements, and sprinkler system components.

On cross-examination, the witness testified that he did not know of his own personal knowledge to whom these dealers sold and that the one-third of the customers who were not in this category were primarily pipeline contractors who sold to farmers or anybody else; that, in his opinion, the valve could be used only for water purposes;

that he had only seen the imported article in actual use three times; that, in each instance, it was for irrigation purposes.

Mr. Lipsett, the vice president of Liberty Equipment & Supply Co., whose business is the sale of piping material for industrial, mechanical, marine, and irrigation setups, was next called on behalf of plaintiff. The witness testified that he has been familiar with the imported items for 3 years and that they are sold by his company primarily in eastern Washington and western Idaho to irrigation supply people; that he has not seen the imported valves in use but only in shop setups; that he has not attempted to sell such an item for industrial uses, since he does not believe it is suitable for a working pressure of 125 pounds per square inch; that he advertises the valve for western agricultural and domestic water use. A copy of said advertisement was received in evidence as plaintiff's exhibit 2.

Mr. Lipsett then testified that the imported valves are sold mainly to irrigation supply houses and that is the basis of his belief that they are used for irrigation purposes whether it be farming or golf courses and sprinkling; that the term "domestic water use" utilized in exhibit 2 means water use around the farm, such as in barns and washdown facilities.

The testimony of the three witnesses called on behalf of defendant may be summarized as establishing that there is produced in the United States a large variety of gate valves which may be utilized for many purposes. A valve with similar characteristics, although heavier in construction, is also produced and sold in the United States. The witnesses agree that a valve such as exhibit 1 can be utilized in controling the flow of liquids within the 125-pound-per-square-inch range. None of the Government witnesses have actually seen the imported valve in use but base their testimony upon their experience in the field. The important factor according to the witnesses called on behalf of defendant is the pressure rating of the valve and not the weight of the article.

Based upon the foregoing record, plaintiff contends it has established a *prima facie* case and that the lightweight gate valves, such as are involved herein, are agricultural implements, as that term has been defined under paragraph 1604 of the Tariff Act of 1930. It is further contended that even though the witnesses did not have actual knowledge of the ultimate use of the gate valves, that the law is settled that a merchant being desirous of increasing the number of customers has every incentive for knowing the uses to which his wares are or may be put and such evidence establishes *prima facie* such uses, citing *Klipstein* v. *United States*, 1 Ct. Cust. Appls. 122,

T.D. 31120; *Catton, Neill & Co. (Ltd.)* v. *United States*, 11 Ct. Cust. Appls. 278, T.D. 39084.

The law with respect to the provision for agricultural implements contained in paragraph 1604 of the Tariff Act of 1930 is well established. It is the plaintiff's burden of proof in such a case to establish that the imported gate valves belong to that class or kind of merchandise chiefly used as agricultural implements. *United States* v. *Boker & Co.*, 6 Ct. Cust. Appls. 243, T.D. 35472. Ordinarily, it must be established that the chief use of the article throughout the United States as of the date of the enactment of the tariff act was as an agricultural implement. *Wilbur-Ellis Co. et al.* v. *United States*, 18 C.C.P.A. (Customs) 472, T.D. 47762. There is some indication in the record that the involved merchandise first came into existence in 1955. The record also indicates that this valve, when the weight is not taken into consideration, is a common ordinary staple item handled by all people in the field, having many uses. Assuming, without deciding, that said valves came into existence as a new article of commerce in 1955, the burden of establishing chief use still rests upon plaintiff. However, the evidence required to establish such use would be limited to such use on or about the date of importation rather than on or about the date of the passage of the tariff act. *United States* v. *Paul G. Downing et al.*, 16 Ct. Cust. Appls. 556, T.D. 43294; *United States* v. *Geo. Wm. Rueff, Inc.*, 41 C.C.P.A. (Customs) 95, C.A.D. 535.

The record herein falls far short of establishing chief use, either on or about the date of importation or on or about the date of the enactment of the tariff act, of said valves as an agricultural implement for many reasons. In the first instance, the testimony relative to its use with irrigation systems does not *prima facie* make the article an agricultural implement since it is obvious, and the court may take judicial notice of the many horticultural uses of irrigation systems. The distinction between horticultural and agricultural purposes has been before this court on prior occasions. The court has held that articles chiefly used for horticultural purposes are not entitled to entry free of duty under the provisions of paragraph 1604 of the Tariff Act of 1930. In addition, the evidence is more or less relegated to use on the west coast and, accordingly, does not give an adequate geographical representation of the use throughout the United States. Counsel for plaintiff, being aware of the latter situation, cited the case of *United States* v. *S. S. Perry*, 25 C.C.P.A. (Customs) 282, T.D. 49395, which involved the classification of certain celluloid poultry leg bands, classified under the provisions of paragraph 31(b)(2) of the Tariff Act of 1930, as all compounds of

cellulose, made into finished articles, and claimed to be entitled to entry free of duty under paragraph 1604 of the Tariff Act of 1930. In the *Perry* case, *supra*, the evidence was similarly restricted to the west coast of the United States, yet the court held the merchandise to be entitled to entry free of duty under said paragraph 1604, *supra*. A discussion of the principles of the *Perry* case, *supra*, as they may be applied herein, was made by the writer in a separate opinion in the case of *F. S. Whelan & Sons* v. *United States*, 40 Cust. Ct. 192, C.D. 1982 (appeal dismissed), involving a similar record and wherein the following statement was made:

I realize, of course, that it was not incumbent upon the plaintiff herein to show that in every part of the United States the chief use of the involved merchandise was as wallboard. The determination of chief use not only involves a territorial or geographical consideration, but, as well, the quantity of the merchandise used. However, chief use must be established generally throughout the United States, and such use cannot be local or partial.

In the case of *United States* v. *S. S. Perry*, 25 C.C.P.A. (Customs) 282, T.D. 49395, it was held that the testimony of one witness that the merchandise there involved was chiefly used as chicken leg bands in the States of California, Oregon, and Washington was sufficient to establish chief use of such merchandise. The witness also testified that the States of California, Oregon, and Washington were the principal poultry centers of the United States. In the present case, we have no testimony indicating that any particular section of the United States is the principal center in which hardboard and wallboard were chiefly used.

The situation here is strikingly similar. There is no evidence in the case at bar to establish that the west coast of the United States is the only market for such valves.

Based upon the record and the foregoing authorities, we are of the opinion that plaintiff has failed to establish that the imported gate valves are entitled to entry free of duty as agricultural implements under the provisions of paragraph 1604 of the Tariff Act of 1930.

The protest is overruled and judgment will be rendered accordingly.