(C.D. 2511)

BORDER BROKERAGE COMPANY *v.* UNITED STATES

United States Customs Court, First Division

(Decided February 15, 1965)

*Lawrence & Tuttle* (*Edward N. Glad* and *George R. Tuttle, Jr.,* of counsel) for the plaintiff.

*John W. Douglas,* Assistant Attorney General (*James F. O'Hara* and *Sheila N. Ziff,* trial attorneys), for the defendant.

Before OLIVER, WILSON and NICHOLS, Judges

NICHOLS, Judge: The merchandise involved in this case was imported from Canada in two lots and entered at the port of Blaine, Wash., on May 3 and July 27, 1960, respectively. It is described on the entry papers as bundles of "Plant Bands of Veneer" or as bundles of "Flat Veneer Strips for making plant boxes—sides only." It was assessed with duty at 16⅔ per centum ad valorem under paragraph 412 of the Tariff Act of 1930, as modified by the Annecy Protocol of Terms of Accession to the General Agreement on Tariffs and Trade, T.D. 52373, supplemented by T.D. 52476, as manufactures of wood, not specially provided for. Claims are made in the protest for free

entry under paragraph 1604 of said tariff act as agricultural implements, not specially provided for, or for classification under paragraph 1558 as nonenumerated manufactured articles or under paragraph 405 as veneers of wood. The first is the only claim which was stressed at the trial or in plaintiff's brief.

The provisions of the tariff act pertinent to the issue presented are as follows:

PAR. 412 [as modified by T.D. 52373 and T.D. 52476]. Manufactures of wood or bark, or of which wood or bark is the component material of chief value, not specially provided for:

\*        \*        \*        \*        \*        \*        \*

Other \* \* \*_____ 16⅔% ad val.

PAR. 1604. Agricultural implements: Plows, tooth or disk harrows, headers, harvesters, reapers, agricultural drills and planters, mowers, horserakes, cultivators, thrashing machines, cotton gins, machinery for use in the manufacture of sugar, wagons and cars, cream separators valued at not more than $50 each, and all other agricultural implements of any kind or description, not specially provided for, whether in whole or in parts, including repair parts: *Provided,* That no article specified by name in Title I shall be free of duty under this paragraph. [Free.]

At the trial, plaintiff called Virgil Langley, assistant manager for the Pein Box & Lumber Co., who testified as follows: His firm manufactures wooden boxes and crates and handles other lumber products. It generally sells its products all over the United States, but its "plant band veneers" are sold mostly in the Northwest. He has been with the firm for 26½ years, and his duties include selling and supervising sales. He is familiar with the "plant band veneers" involved herein and has sold such merchandise to greenhouses during all the time he has been with the company. He produced samples of the merchandise, which were received in evidence as plaintiff's exhibits 1 and 2.

Plaintiff's exhibit 1 (called a veneer) is a thin strip of wood approximately 9¾ inches long and 2¾ inches high. It has five dividing lines or light incisions approximately 2 inches apart. Plaintiff's exhibit 2 (also called a veneer) is approximately 11½ inches long and appears to be broken at one end. It is about 2¾ inches wide and has four dividing lines approximately 2¾ inches apart. These exhibits are not really veneers. The witness testified that the line or score marks the point at which the strip may be folded without being broken and that the only difference between the two sizes is that they are scored at different points. If small plants are to be grown, the smaller size is used, and if larger plants are to be grown, the larger one is used.

The witness has sold these items to greenhouses and farmers for about 26½ years. He has talked with customers and has seen them

used in greenhouses. The band is folded at each point where it is scored and stitched with a little staple, forming a square. It is then set in a plant flat, an area 14½ by 18½ inches. It is filled with dirt, the extra dirt wiped off, and the plant is set right in the middle. These items are used primarily for vegetable growing, "what we call bedding plants." After the plant is grown, it is taken to the retail stand to be sold. The witness explained:

> After the plant is grown it is much easier to take this to the retail stand to be sold, because the customer can pick up one at a time.
>
> JUDGE WILSON : It serves as an individual container?
>
> THE WITNESS : Individual container, and the roots are protected.

According to the witness, the bands do not have to be removed before the plant is transplanted as they will disintegrate in the ground.

During the course of his experience, Mr. Langley has observed these bands used with tomato plants, cauliflower, cabbage, and peppers. In the past, he has seen them used to grow pansies, but he has never seen them used with any other flowering plants, although they could be so used. Currently, pansies are being grown in plastic plant bands, because customers like to select the good plants and the plastic bands slide up easier than the wooden ones. In his experience, the wooden bands are used primarily for growing and transferring vegetable plants. His personal observation has been in about a 50-mile radius of Portland, and the bulk of his sales has been within that area. Such merchandise is also sold in the States of Idaho and Washington. He could not state exactly where he had seen these bands used with tomato plants, but said that the last time he saw them so used was on a retail stand where they sell vegetables to home gardeners, not to farmers.

A pricelist including plant bands such as those involved herein was received in evidence as defendant's exhibit B. Examples of larger sized plant bands were received in evidence as plaintiff's illustrative exhibits 3, 4, and 5. They are the same as plaintiff's exhibits 1 and 2, except that the scoring marks are farther apart.

On the record presented, plaintiff claims to have established *prima facie* that the plant band veneers are entitled to free entry as agricultural implements because they are chiefly used for the growing of vegetable bedding plants and that such use constitutes an agricultural pursuit. Defendant contends that the evidence does not prove that they are chiefly used as agricultural implements.

The meaning of the term "agricultural implements" in the predecessor to paragraph 1604, *supra*, was set forth in *United States* v. *Boker & Co.*, 6 Ct. Cust. Appls. 243, T.D. 35472, as follows (pp. 244–245) :

While, therefore, "agriculture" in its broad application may extend into and include elements of horticulture, viticulture, arbor culture, and other *allied* industries and pursuits, in its primary significance it extends to and embraces only those parts of all such as pertain to human and incidental animal subsistence— the substantial requirements of life (food) and possibly man's comfort (raiment), and not the merely pleasurable pursuits; the necessities and not the essentially pleasurable or ornamental.

&ast; &ast; &ast; &ast; &ast; &ast; &ast;

All these considerations imply and necessitate that the use of the implement must determine its classification whether or not an agricultural implement within the paragraph, and that that use, and the determinative fact, is chief use. [Emphasis quoted.]

The merchandise involved in that case was hedge shears. The court noted that hedges were purely ornamental and did not contribute to the subsistence of man or beast directly or indirectly. Since the record afforded no evidence as to whether the hedge shears were chiefly used for trimming purely ornamental hedges, or the subsistence productions of the agriculturist, the claim for free entry was overruled.

Similarly, in *Wonham (Inc.) et al.* v. *United States*, 20 CCPA 198, T.D. 45982, it was held that bamboo rakes were not classifiable as agricultural implements. The record showed that the rakes were used by farmers for raking up litter in barns, and by farmers and others in vegetable gardens and strawberry patches, and for raking lawns and flowerbeds. The court held that the evidence tended to establish that the articles were used for agricultural purposes, but that it was not sufficient to establish that they were chiefly used in that manner.

In *United States* v. *Spreckels Creameries, Inc.*, 17 CCPA 400, T.D. 43835, it was held that cylindrical cans, made of metal and intended for use in the transportation of milk, were not classifiable as agricultural implements, since the record failed to establish that their chief use was on the farm or by farmers or for transportation by cooperative associations composed of farmers.

Plaintiff relies on *United States* v. *S. S. Perry*, 25 CCPA 282, T.D. 49395, in which it was held that the imported celluloid leg bands were chiefly used for the identification of poultry by those in the business of raising poultry and were free of duty under paragraph 1604, *supra*, as agricultural implements. The sole witness testified that the principal poultry center of the United States was in the three Pacific Coast States and that he had sold this type of merchandise throughout that section and had seen it used as leg bands for poultry. The court held that the witness was well qualified to give an opinion and stated (pp. 289–290):

&ast; &ast; &ast; Woodhull's greatest activities during the ten years immediately preceding his testifying were in the principal poultry raising centers of the United

States. Who could be better qualified to give an opinion upon the question? In the next place, if it should appear that in some places in the United States the article was chiefly used for another purpose this fact would not of itself be sufficient to determine that it was not chiefly used for agricultural purposes in the United States. The determination of chief use not only involves a territorial or geographical consideration but the quantity of the merchandise used. It is obvious that poultry is raised in every section of the United States. If the Government's contention, which, in effect, is that a witness or witnesses must be produced to prove actual use in every part of the United States, was approved, in our judgment it would result in a situation where it would be almost impossible to overcome a presumed finding by the collector such as has arisen in this case.

The general rule is that chief use is a question of actual fact which should be established on the basis of positive testimony representative of an adequate geographical cross-section of the nation. *L. Tobert Co., Inc., American Shipping Co.* v. *United States*, 41 CCPA 161, 164, C.A.D. 544. It is the use of the particular class or type of goods which determines chief use, not that of the particular shipment in question. *United States* v. *Spreckels Creameries, Inc., supra; United States* v. *The Baltimore & Ohio R.R. Co.*, 47 CCPA 1, C.A.D. 719. These principles have been followed in cases involving chief use for agricultural purposes. *The A. W. Fenton Co., Inc.* v. *United States*, 40 Cust. Ct. 327, C.D. 2002; *Mohns Commercial Company* v. *United States*, 44 Cust. Ct. 247, C.D. 2183; *California Wool Growers Assn. et al.* v. *United States*, 34 Cust. Ct. 295, Abstract 58797.

In *The A. W. Fenton Co.* case, the court pointed out "that an agricultural implement is one employed in farming or husbandry, which plays a direct role in the production of food or clothing and is chiefly used for that purpose." (Pp. 328–329.) It was held that the testimony of one witness that so-called crop dusters were used in greenhouses and nurseries fell short of establishing that they were chiefly used as agricultural implements, in view of the fact that his experience did not extend beyond the States of California, Michigan, Ohio, and a part of New York.

The *Mohns Commercial Company* case, *supra*, involved certain lightweight gate valves, claimed to be chiefly used for agricultural irrigation. The court stated (p. 252):

* * * In the first instance, the testimony relative to its use with irrigation systems does not *prima facie* make the article an agricultural implement since it is obvious, and the court may take judicial notice of the many horticultural uses of irrigation systems. The distinction between horticultural and agricultural purposes has been before this court on prior occasions. The court has held

that articles chiefly used for horticultural purposes are not entitled to entry free of duty under the provisions of paragraph 1604 of the Tariff Act of 1930. In addition, the evidence is more or less relegated to use on the west coast and, accordingly, does not give an adequate geographical representation of the use throughout the United States.

The court then distinguished *United States* v. *S. S. Perry, supra,* on the ground that there was no evidence to establish that the west coast of the United States was the only market for such valves.

The *California Wool Growers* case, *supra,* involved secateurs and hoof knives used to pare out the infected parts of the hooves of cattle or sheep. The witness testified that they were sold in every state of the Union to dealers, veterinarians, veterinary supply stores, drugstores, and feed stores, but that he had not seen them used in any state, except California. The court held that, in the absence of testimony showing that California was the chief sheep-growing center of the United States, the testimony was insufficient to establish that the merchandise was chiefly used for agricultural purposes.

In the instant case, the witness testified that he had seen these plant bands used in greenhouses in connection with growing certain vegetable plants. He had also seen them used for the growing of pansies in prior years, although not currently. He had seen tomato plants in these bands sold at retail stands to home gardeners. Although his firm sold this merchandise to customers in Washington and Idaho, as well as Oregon, his observation was limited to a 50-mile radius of Portland. There is a statement that these items are sold to farmers, but there is no evidence as to how they are used by farmers or to what extent they are sold to them. The testimony based on the witness' observation indicates that the bands are used to enclose plants grown in greenhouses and sold at retail stands to home gardeners. Such bands were also used, at least in the past, in connection with the growing of pansies, which is not an agricultural use. There is no evidence that Portland is the chief center in the United States for the growing of plants with the use of these bands. The record is confined to the use of this manufacturer's merchandise and does not show the use or uses of the class to which it belonged. It is clear that the evidence presented is insufficient to establish that this class of merchandise was chiefly used as agricultural implements throughout the United States.

In view of plaintiff's failure to prove that the merchandise is properly classifiable as agricultural implements and since no evidence has been produced to support the other claims in the protest, the protest must be overruled. Judgment will be rendered accordingly.