(C.D. 2256)

NATIONAL STARCH PRODUCTS, INC. *v.* UNITED STATES (INDEX INDUSTRIAL CORP., PARTY IN INTEREST)

United States Customs Court, Second Division

(Decided May 18, 1961)

*Lamb & Lerch* (*John G. Lerch* of counsel) for the plaintiff.
*William H. Orrick, Jr.,* Assistant Attorney General (*Alfred A. Taylor, Jr.,* trial attorney), for the defendant.
*William J. Barnhard* for the party in interest.
*Robert N. Hawes* as *amicus curiae.*

Before LAWRENCE, RAO, and FORD, Judges; FORD, J., concurring

RAO, Judge: This is an American manufacturer's protest filed pursuant to the provisions of section 516(b) of the Tariff Act of 1930, as amended. It challenges the collector's classification of certain imported particle board, in sheets 4 feet by 8 feet, as wallboard within

the provisions of paragraph 1402 of said act, as modified by the Annecy Protocol to the General Agreement on Tariffs and Trade, 84 Treas. Dec. 403, T.D. 52373, supplemented by Presidential proclamation, 85 Treas. Dec. 116, T.D. 52462, with the consequent assessment of duty at the rate of 5 per centum ad valorem.

Plaintiff claims that said merchandise is not wallboard and, hence, is properly provided for in paragraph 1539(b) of said act, as modified by the Sixth Protocol of Supplementary Concessions to said General Agreement on Tariffs and Trade, 91 Treas. Dec. 150, T.D. 54108, as manufactures wholly or in chief value of a product of which a synthetic resin is the chief binding agent, at the rate of 21 cents per pound and 17 per centum ad valorem.

The respective trade agreement provisions read as follows:

Paragraph 1402 and T.D. 52373, *supra*:

Paper board, wallboard, and pulpboard, including cardboard (but not including leather board or compress leather, and except strawboard, solid fiber shoe board and all counter board, and pulpboard in rolls for use in the manufacture of wallboard), not plate finished, supercalendered or friction calendered, laminated by means of an adhesive substance, coated, surface stained or dyed, lined or vat-lined, embossed, printed, decorated or ornamented in any manner, nor cut into shapes for boxes or other articles and not specially provided for:
   Wallboard and wet machine board other than beer mat board__ 5% ad val.

Paragraph 1539(b) and T.D. 54108, *supra*:

Laminated products (whether or not provided for elsewhere in the Tariff Act of 1930 than in paragraph 1539(b) thereof) of which any synthetic resin or resin-like substance is the chief binding agent:
   *       *       *       *       *       *       *
Manufactures wholly or in chief value of any product described in the preceding item 1539(b), or of any other product of which any synthetic resin or resin-like substance is the chief binding agent_____ 21¢ per lb. and
                                                    17 percent ad val.

It is not disputed that the procedural steps for perfecting an American manufacturer's protest have been complied with, and the respective qualifying papers have been introduced into evidence as plaintiff's exhibits 1–A through 1–K, inclusive. Plaintiff cites the following excerpt from plaintiff's exhibit 1–E, a letter from the Acting Commissioner of Customs to counsel for the plaintiff, as properly posing the issue to which its protest is addressed:

On January 16, 1959, your client was informed by the Bureau that it is the practice of the Customs Service to classify particle board of which a synthetic resin or resin-like substance is the chief binding agent as wallboard under paragraph 1402, Tariff Act of 1930, if imported in standard wallboard sizes and not processed or finished in any manner specified in that paragraph, or as manufactures wholly or in chief value of any product of which synthetic resin or resin-like substance is the chief binding agent under paragraph 1539(b) of the tariff act, if imported in other than wallboard sizes or processed or finished in any manner specified in paragraph 1402.

The record establishes that particle board is a wood product made from chips or flakes of wood, bonded with a synthetic resin, usually formaldehyde, and pressed into sheets in a hot plate press. It was first produced commercially in the United States in about the year 1946. Since that time, several domestic companies have undertaken to manufacture particle board, and it has also been imported. In either case, the resultant product is sufficiently similar to be identified as merchandise of the same class or kind, and directly competitive. Samples of the instant importation and of several of the domestic particle boards are in evidence as plaintiff's exhibits 2, 3, 4, 5, 6, 9, 10, 11, and 12.

It appears from the testimony of the customs examiner who passed the instant importation that his advisory classification thereof as wallboard resulted from an investigation he conducted in 1948 or 1950, in which he sought from the importer information as to the use of particle board. His inquiry led him to the conclusion that sheets of particle board in the standard width of 4 feet, in 6- to 12-feet lengths, or 8 feet by 8 feet, or ceiling tiles, 12 inches by 12 inches, were chiefly used as wallboard.

Ten witnesses called by the plaintiff testified to the contrary. They were Alfred Battaglia, a chemist, who, as product manager of the structural products division of the National Starch & Chemical Co., had direct sales responsibilty for the distribution of his company's particle board, in all states east of the Mississippi River, and north of North Carolina, including contact with retailers and their customers;

George I. Fischer, product manager and national sales manager of the particle board, known as Novoply, produced by the United States Plywood Corp. This company markets Novoply on a nationwide basis. It is the duty of its product manager to ascertain where and how Novoply is used, and to disseminate the information he acquires throughout the 120 branch offices of the company;

Richmond Gray, vice president in charge of sales for the Gray Products Co., Inc., whose particle board, bearing the brand name Graco Flakecore, is sold throughout the eastern half of the United States, in all states, other than Louisiana and Mississippi;

David Greeley, manager of field operations for the Silvatek Division of the Weyerhaeuser Co., having sales representation in every state of the United States, for the marketing of its particle boards, known as Versabord and Versaflake;

Jack W. Holdsworth, sales manager for the West Virginia Pulp & Paper Co., which sells its particle board, Westvaco Flake Board, throughout the East, as far south as Virginia, and in portions of the Middle West. The selling experience of this witness included sales of insulation board for the Armstrong Cork Co., and of hardboard for the Masonite Co.;

Henry S. Richards, Baltimore, Md., branch manager for United States Plywood Corp., who sells Novoply in Maryland and in parts of Virginia, West Virginia, and Pennsylvania;

Philip Tulchin, vice president of the Tulnoy Lumber Co., a retail and jobbing lumber company of Brooklyn, N.Y., which sells Versabord, and a good many wallboards, servicing an area of approximately 100 miles in diameter;

Charles C. Travis, a partner of Travis-Applegate Co., of Grand Rapids, Mich., a mill representative for the sale of lumber, plywood, veneers, plastics, and Graco products in the State of Michigan;

James W. Lawlor, president of the Feely-Lawlor Lumber Co. of Seattle, Wash., engaged in the wholesale distribution of lumber and other building materials, including Versabord, in the western part of Washington;

Frank P. Whittle, in charge of the plywood sales department for Daniel Buck, Inc., a wholesale distributor of lumber and plywood in Philadelphia, Pa., which handles Westvaco products.

In substance, these witnesses testified that particle board is primarily a core or filler material which is covered either with a wood veneer or a decorative plastic, such as Formica, in the manufacture of dinette furniture, particularly tabletops, kitchen counters, cabinets, store fixtures, furniture case goods, musical instrument cases, electrical mounting boards, baffle boards, and games. For such purposes, standard sizes of sheets of particle board may vary greatly from widths of 30 to 36 inches and lengths up to 120 inches. It is also used as a floor underlayment for resilient flooring, such as linoleum, in kitchens and playrooms, and for doors. With respect to the last-mentioned two uses of particle board, 4 by 8 sheets are particularly suitable, as they are common sizes in the construction industry.

Generally defining wallboard as a surfacing material or paneling applied to a wall or ceiling or used to form a wall, the witnesses for the plaintiff all agreed that, regardless of the size of the sheet, particle board was not only not used as wallboard, but was not suitable for such use. Perhaps the principal reason for this, to which all of the witnesses subscribed, was that there was too great a price differential between particle board and standard wallboards, such as Celotex, Upson Board, Gypsum Board, Homosote, and other plaster and fiberboards used as wallboards. Comparison costs given established that the maximum price of wallboard would not exceed 8 cents a square foot, although generally such boards are available for as little as 4 cents a square foot. Particle board, on the other hand, ranges from a minimum of 11 cents per foot to as much as 17 or 18 cents per foot.

The evidence further established that particle board is not suitable for wallboard because it does not take a good paint surface; it lacks dimensional stability, in that it tends to change dimensionally under

changes in moisture conditions; it has no fireproofing properties; it can not be taped so as to conceal the joints; and, in its customary thicknesses of five-eighths or three-fourths of 1 inch, it is too thick to match traditional moldings and too heavy to rest against studs or joists which form the framework of walls.

By contrast, standard wallboards are too soft and spongy to be adapted for use as floor underlayment, and too lacking in strength and screw-holding power to be suitable for use in the manufacture of furniture.

There are suggestions in the record, only casually explored in cross-examination of certain of the witnesses, that some particle boards are sold and used as decorative wall panels. To the extent that they are, which is in no wise clearly indicated, it appears that these are thinner boards than those represented by the exhibits before the court.

In any event, it has been affirmatively established that of the millions of feet of particle board marketed nationally by the combined operations of the several companies with which the witnesses at bar were affiliated not more than a minor fraction thereof, if indeed any at all, was ultimately applied to wallboard uses.

Plaintiff's evidence has not been controverted. Counsel for the party in interest advised the court, at the conclusion of plaintiff's case, that he elected to stand upon the presumption of correctness attaching to the collector's classification of the merchandise at bar, for the reason that—

* * * We think there has been no evidence of the end uses of the imported particle board. We think there has been no evidence as to the chief uses of the imported particle board. There has been no evidence at all as to the uses of particle board, of the imported particle board, at the time this new and different article was introduced into the commerce of the United States, and I think on this basis, we are going to rely on our briefs, and not put on any witnesses at all.

The court has not been provided with further expression of the views of the party in interest, which, though afforded ample opportunity to do so, has omitted to file a brief in this case.

It is apparent from the record and from the proceedings preliminary to the institution of this action, that the collector's classification of the merchandise at bar as wallboard, within the provisions of paragraph 1402, as modified, *supra*, resulted from his conclusion that it consists of a class of material which is chiefly used in the forming of walls. To the extent that he has interpreted the *eo nomine* provision for wallboard as one contemplating use, his conclusion accords with the court's understanding of the definition of that term.

Wallboard is defined in Webster's New International Dictionary of the English Language, 2d edition, 1951, as follows:

Any boarding designed to serve as, or to be used against, a wall; as a *wallboard* in a schoolroom; specif., an artificial board of wood fiber, cane fiber, or the like, made in large sheets and used for the interior sheathing of the walls of rooms.

· That this is the sense in which Congress employed that term in the Tariff Act of 1930 seems to flow from the following excerpt from the Hearings before a Subcommittee of the Committee on Finance, United States Senate, Seventy-First Congress, First Session, on H.R. 2667, the bill which became the 1930 act:

Statement of Dutro C. Cale representing Certain-Teed Products Corporation, New York City

\* \* \* \* \* \* \*

SENATOR THOMAS. What use is made of this wallboard?

MR. CALE. It is used for walls in the homes of people of moderate circumstances, not men with extravagant homes, but in small towns and country districts skilled labor is not easily available.

SENATOR THOMAS. It takes the place of plaster.

MR. CALE. Yes.

SENATOR THOMAS. Nailed on to the studding?

MR. CALE. Yes.

SENATOR THOMAS. And the joints are covered with a little wooden board giving a natural effect.

MR. CALE. Yes, they are covered.

SENATOR THOMAS. And when used that way and painted they give a very good appearance and it is very warm and it is serviceable?

MR. CALE. Yes, that is a fact and it is economical.

SENATOR THOMAS. And it is used by the small people of the country, the folks who are not able to build expensive buildings.

MR. CALE. Yes, probably in that type of building.

By its every intendment, wallboard is a designation which can only be interpreted in terms of use if its meaning is to be properly expressed. It relates to a class of articles having those properties which devote them to the particular use of forming the interior walls of rooms and buildings.

Under well-settled principles of law, where use is the criterion for determining the scope of a provision and its application to a given importation, that which must be considered is chief use. *United States* v. *James P. Heffernan Paper Co.*, 17 C.C.P.A. (Customs) 61, T.D. 43358; *United States* v. *C. J. Tower & Sons*, 26 C.C.P.A. (Customs) 1, T.D. 49534. The proposition to be resolved is whether the importation in issue belongs to that class or kind of merchandise which is chiefly used for the designated purpose. *Pacific Guano & Fertilizer Co. et al.* v. *United States*, 15 Ct. Cust. Appls. 218, T.D. 42240.

Chief use is a question of fact which must be established on the basis of representative applications over an adequate geographical cross-section of the country. *L. Tobert Co., Inc., and American Shipping Co.* v. *United States*, 28 Cust. Ct. 456, Abstract 56581, affirmed 41 C.C.P.A. (Customs) 161, C.A.D. 544. It does not depend upon the use of the particular importation, but rather on the use of the class of merchandise to which the importation belongs. *Pacific Guano &*

*Fertilizer Co. et al.* v. *United States, supra*; *H. J. Baker & Bro.* v. *United States*, 37 C.C.P.A. (Customs) 52, C.A.D. 419.

Consequently, it is immaterial to this discussion that the instant record is barren of evidence of the ultimate uses of the merchandise at bar.

In the recent case of *United States* v. *The Baltimore & Ohio R.R. a/c United China & Glass Company*, 47 C.C.P.A. (Customs) 1, C.A.D. 719, our appellate court adverted to some of the principles bearing upon the doctrine of chief use. It was there stated:

> However, it is not the use of a particular shipment but rather that of the particular class or type of goods involved which determines its chief use. *United States* v. *Spreckels Creameries, Inc.*, 17 CCPA 400, T.D. 43835.

> Moreover, while the meaning of an eo nomine designation must be determined as of the enactment of the provision, *United States* v. *C. J. Tower & Sons*, 26 CCPA 1, T.D. 49534, where there is a classification expressly dependent on the chief use of the class of merchandise involved, the determination of such use of the imported class of merchandise should be made as of the date of importation thereof. *H. J. Baker & Bro.* v. *United States*, 37 CCPA 52, C.A.D. 419, and cases there cited. With reference to this proposition, this court stated in *Wilbur-Ellis Co., et al.* v. *United States*, 18 CCPA 472, T.D. 44762, at page 479:

> > * * * if there be an *eo nomine* designation, the common meaning thereof must be determined as of the date of the enactment of the tariff act, but if it is further provided that the thing designated shall be classified under a given provision only if chiefly used for a specified purpose, the question of use should be determined, *not as of the effective date of the tariff act but as of the date of the importation of the particular merchandise involved or immediately prior thereto.* [Emphasis ours.]

> We believe that where, as here, classification is to be determined on the basis of chief use, that determination should be made at the time of importation, whether or not the tariff provision in question explicitly requires classification by chief use. [Italics quoted.]

The rule that use at the time of importation is the controlling consideration has particular and necessary application in the case of a commodity not known to commerce at the time of the enactment of the provision under consideration.

In view of what we have stated to be the meaning of wallboard, it may be presumed that when the collector invoked the provision therefor for the classification of particle board in standard wallboard sizes, he found as a fact that it was included within a class of merchandise chiefly used in the formation of walls, and that determination is, of course, presumptively correct. *Dorward & Sons Co.* v. *United States*, 40 C.C.P.A. (Customs) 159, C.A.D. 512, *United States* v. *Marshall Field & Co.*, 17 C.C.P.A. (Customs) 1, T.D. 43309.

But a presumption is not evidence and may not be weighed against evidence. *Morse Bros. (Inc.)* v. *United States*, 13 Ct. Cust. Appls. 553, T.D. 41432. It requires but a "small degree of competent proof" to overcome it. *Kroder Reubel Co., Inc.*, and *Alltransport, Inc.* v. *United States*, 44 Cust. Ct. 274, C.D. 2186.

The instant record provides considerably more than "a small degree of competent proof" with respect to the chief use of particle board of the dimensions here involved. The evidence is abundant, clear, and convincing that, regardless of dimensions, particle board is not only not used as wallboard, but that it is not suitable for such use. Ten witnesses having direct contact with the sale of particle board, and personal knowledge of its ultimate uses, whose combined experiences embrace every area of the country, positively asserted that particle board had no market in the wallboard trade, and conversely that wallboards were not suited to the ultimate purposes served by particle board. As succinctly stated by the witness Holdsworth—

If they were able to use it, our sales wouldn't be at the level they are now certainly, and if we were able to use our board as a wall material, our sales would be much greater than they are at the present time.

Moreover, we deem it especially significant that the evidence establishes that particle board is not practically nor commercially suitable for wallboard purposes. If it is not economically feasible to substitute particle board for wallboard, and the former does not possess desirable properties for use as wallboard, it is fairly and reasonably inferable that it is not so used to any substantial extent. Chief use in this area of application would seem, therefore, to have been clearly negated.

By reason of the foregoing, we find and hold that whether or not in so-called standard wallboard dimensions, particle board is not wallboard within the contemplation of paragraph 1402, as modified, *supra.* Since it has been established that a synthetic resin is the chief binding agent in the instant as well as in all particle board, the claim of the plaintiff for classification of such merchandise within the provisions of paragraph 1539 (b) as modified, *supra*, with the consequent assessment of duty at the rate of 21 cents per pound and 17 per centum ad valorem, is sustained.

Judgment will be entered accordingly.

CONCURRING OPINION

FORD, Judge: Based upon the record herein, I concur with the majority in the result. I, however, do not agree with the majority's interpretation of the case of *United States* v. *The Baltimore & Ohio R.R. a/c United China & Glass Company*, 47 C.C.P.A. (Customs) 1, C.A.D. 719.

In the case of merchandise, such as is involved herein, which came into existence after the passage of the Tariff Act of 1930, it is obvious that proof of chief use at the time of the passage of the act is not possible. Therefore, chief use at the time of importation is controlling

on the principle that tariff acts are intended for the future as well as for the present and will embrace merchandise whose existence was not known to commerce prior to the effective date of the tariff act. *United States* v. *Paul G. Downing*, 16 Ct. Cust. Appls. 556, T.D. 43294; *V. W. Davis* v. *United States*, 16 Cust. Ct. 163, C.D. 1005 (affirmed *sub nom Victor W. Davis, Jr., Administrator, etc.* v. *United States*, 35 C.C.P.A. (Customs) 79, C.A.D. 374) ; *United States* v. *Geo. Wm. Rueff, Inc.*, 41 C.C.P.A. (Customs) 95, C.A.D. 535.